KING, Circuit Judge,
dissenting:
Although there are approximately 11.3 million removable aliens in this country today, for the last several years Congress has provided the Department of Homeland Security (DHS) with only enough resources to remove approximately 400,000 of those aliens per year-.[1] Recognizing DHS’s congressionally granted prosecuto-rial discretion to set removal enforcement priorities, Congress has exhorted DHS to use those resources to “mak[e] our country safer.” In response, DHS has focused on removing “those who represent threats to national security, public safety, and border security.” The DAPA Memorandum at issue here focuses on a subset of removable aliens who are unlikely to be removed unless and until more resources are made *189 available by Congress: those who are the parents of United States citizens or legal permanent residents, who have resided in the United States for at least the last five years, who lack a criminal record, and who are not otherwise removal priorities as determined by DHS. The DAPA Memorandum has three primary objectives for these aliens: (1) to permit them to be lawfully employed and thereby enhance their ability to be self-sufficient, a goal of United States immigration law since this country’s earliest immigration statutes; (2) to encourage them to come out of the shadows and to identify themselves and where they live, DHS’s prime law enforcement objective; and (3) to maintain flexibility so that if Congress is able to make more resources for removal available, DHS will be able to respond.
Plaintiffs do not challenge DHS’s ability to allow the aliens subject to the DAPA Memorandum — up to 4.3 million, some estimate — to remain in this country indefinitely. Indeed, Plaintiffs admit that such removal decisions are well within DHS’s prosecutorial discretion.[2] Rather, Plaintiffs complain of the consequences of DHS’s decision to use its decades-long practice of granting “deferred action” to these individuals, specifically that these “illegal aliens” may temporarily work lawfully for a living and may also eventually become eligible for some public benefits. Plaintiffs contend that these consequences and benefits must be struck down even while the decision to allow the “illegal aliens” to remain stands. But Plaintiffs’ challenge cannot be so easily bifurcated. For the benefits of which Plaintiffs complain are not conferred by the DAPA Memorandum — the only policy being challenged in this case — but are inexorably tied to DHS’s deferred action decisions by a host of unchallenged, preexisting statutes and notice-and-comment regulations enacted by Congresses and administrations long past. Deferred action decisions, such as those contemplated by the DAPA Memorandum, are quintessential exercises of prosecutorial discretion. As the Supreme Court put it. sixteen years ago, “[a]t each stage [of the removal process] the Executive has discretion to abandon the endeavor, [including by] engaging in a regular practice (which had come to be known as ‘deferred action’) of exercising that discretion for humanitarian reasons or simply for its own convenience.”[3] Because all parties agree that an exercise of prosecu-torial discretion itself is unreviewable, this case should be dismissed on justiciability grounds.
Even if this case were justiciable, the preliminary injunction, issued by the district court, is a mistake. If the Memorandum is implemented in the truly discretionary, case-by-case manner it contemplates, it is not subject to the APA’s notice-and-comment requirements, and the injunction cannot stand. Although the very face of the Memorandum makes clear that it must be applied with such discretion, the district court concluded on its own — prior to DAPA’s implementation, based on improper burden-shifting, and without seeing the need even to hold an evidentia-ry hearing — that the Memorandum is a sham, a mere “pretext” for the Executive’s plan “not [to] enforce the immi *190 gration laws as to over four million illegal aliens.” Texas v. United States, 86 F.Supp.3d 591, 638 (S.D.Tex.2015) [hereinafter Dist. Ct. Op.]. That conclusion is clearly erroneous. The majority affirms and goes one step further today. It holds, in the alternative, that the Memorandum is contrary to the INA and substantively violates the APA. These conclusions are wrong. The district court expressly declined to reach this issue without further development, id. at 677, and the limited briefing we have before us is unhelpful and unpersuasive. For these reasons, as set out below, I dissent.
I. The DAPA Memorandum
For all of the pounds of paper written about it, the DAPA Memorandum spans only five pages, and I attach it to this dissent for all to read.[4] The D.C. Circuit (which hears more of these administrative law cases than any other) has wisely observed that “[s]ometimes a simple reading of the document and study of its role in the regulatory scheme will yield the answer.” Pub. Citizen, Inc. v. U.S. Nuclear Regulatory Comm’n, 940 F.2d 679, 682 (D.C.Cir.1991).
The DAPA Memorandum is one of a series of memoranda issued by Secretary of Homeland Security Jeh Johnson on November 20, 2014. Broadly speaking, the Memorandum does two things: (1) it expands certain parameters of the prior DACA Memorandum, which provided guidelines for, the use of deferred action with respect to certain individuals who came to the United States as children; and (2) it includes “guidance for case-by-case use of deferred action for those adults who have been in this country since January 1, 2010, are the parents of U.S. citizens or lawful permanent residents, and who are otherwise not enforcement priorities.” Appx. A, at 3.
It is important to recognize at the outset the backdrop upon which the Memorandum was written. As noted above, given the resource constraints faced by DHS, the agency is faced with important prioritization decisions as to which aliens should be the subject of removal proceedings. Congress has made clear that those decisions are to be made by DHS, not by Congress itself — and certainly not by the courts. Indeed, Congress has delegated to the Secretary of Homeland Security the authority to “[e]stablish[ ] national immigration enforcement policies and priorities,” 6 U.S.C. § 202(5),[5] and to “establish such regulations; ... issue such instructions; and perform such other acts as he deems necessary for carrying out” his responsibilities, 8 U.S.C. § 1103(a)(3).[6] Congress has given the Secretary some direction, in appropriations bills, as to how removal resources should be spent — by specifically devoting funding toward “identifying] aliens convicted of' a crime who may be deportable, and ... removing] them from the United States once they are judged deportable,” and by making clear that' the Secretary “shall prioritize the identification and removal of aliens convicted of a crime by the severity of that crime.” Department of Homeland Securi *191 ty Appropriations Act, Pub.L. No. 114-4, 129 Stat. 39, 43 (2015).
In an apparent effort to maximize the resources that can be devoted to such ends and consistent with his congressionally granted authority to set enforcement priorities, the Secretary contends that he has chosen — through the DACA and DAPA Memoranda — to divert some of DHS’s resources away from the lowest priority aliens to better enforce the immigration laws against the highest priority aliens. See Arpaio v. Obama, 797 F.3d 11, 17-18 (D.C.Cir.2015) (“DACA and DAPA ... apply to the portion of the population that [DHS] considers not threatening to public safety and that has not had any involvement, or only minimal and minor involvement, with the criminal justice system.”). By granting deferred action to children who were brought to this country unlawfully, and to the parents of U.S. citizens and lawful permanent residents (who otherwise have clean records), DHS has sought to “encourage [those individuals] to come out of the shadows, submit to background checks, pay fees, apply for work authorization ... and be counted.” Appx. A, at 3. Qualifying individuals can therefore work “on the books” — meaning, of course, that they will pay taxes on the income they earn. Furthermore, the Secretary points to the humanitarian aim of the DAPA Memorandum which, in conjunction with the DACA Memorandum, keeps families together — at least temporarily. Cf. Reno, 525 U.S. at 484, 119 S.Ct. 936 (describing “deferred action” as an “exercis[e] [of] discretion for humanitarian reasons or simply for [the Executive’s] own convenience”). And by encouraging removable aliens to self-identify and register, both DACA and DAPA allow DHS to collect information (names, addresses, etc.) that will make it easier to locate these aliens in the future — if and when DHS ultimately decides to remove them. DHS is, of course, a law enforcement agency, and this is what we would call “good policing.” Although these programs will likely apply to a large number of individuals, that result is the inevitable upshot of decades of congressional appropriations decisions,[7] which require DHS (whether by policy or by practice) to de-prioritize millions of removable aliens each year due to these resource constraints.
The DAPA Memorandum operates in two ways. First, with respect to the expansion of DACA, the DAPA Memorandum: removes the age cap (the DACA Memorandum excluded applicants over 31 years of age); extends the period of deferred action from two to three years; and adjusts the date-of-entry requirement from June 15, 2007, to January 1, 2010. Second, the Memorandum establishes new deferred action guidance, “directing] US-CIS to establish a process, similar to DACA, for exercising prosecutorial discretion through the use of deferred action, on a case-by-case basis, to those individuals” who meet six threshold criteria:
• have, on the date of this memorandum, a son or daughter who is a U.S. citizen or lawful permanent resident;
• have continuously resided in the United States since before January 1, 2010;
• are physically present in the United States on the date of this memorandum, and at the time of making a request for consideration of deferred action with USCIS;
*192 • have no lawful status on the date of this memorandum;
• are not an enforcement priority as reflected in the [Enforcement Priorities Memorandum[8]]; and
• present no other factors that, in the exercise of discretion, makes the grant of deferred action inappropriate.
Appx. A, at 4.
The Memorandum describes deferred action as a “form of prosecutorial discretion by which the Secretary deprioritizes an individual’s case for humanitarian reasons, administrative convenience, or in the-interest of the Department’s overall enforcement mission.”[9] Appx. A, at 2. The Memorandum makes clear that deferred action: must be “granted on a case-by-ease basis”; “may be terminated at any time at the agency’s discretion”;[10] and “does not confer any form of legal status in this country, much less citizenship.!’ Appx. A, at 2. The Memorandum also states that although “immigration officers will be provided with specific eligibility criteria for deferred action, ... the ultimate judgment as to whether an immigrant is granted deferred action will be determined on a case-by-case basis.” Appx. A, at 5. In addition, the Memorandum makes clear that applicants must submit to a background check and pay a $465 fee.[11] Appx. A, at 4-5. It notes that deferred action recipients are eligible to apply for employment authorization.[12] Appx. A, at 4. Finally, the Memorandum states that it “confers no substantive right, immigration status or pathway to citizenship.” Appx. A, at 5.
Holding that Plaintiffs’ challenge to this Memorandum is likely to succeed on the merits, the majority reaches four conclusions, the first three of which were reached by the district court, to sustain the preliminary injunction: (1) Plaintiffs have standing; (2) this case is justiciable and reviewable under the APA; (3) the DAPA Memorandum constitutes a substantive rule that must go through the notice-and-comment process; and (4) the DAPA Memorandum is not authorized by statute and is a substantive violation of the APA. As to the first conclusion, the majority finds that Texas is entitled to “special solicitude” in the standing analysis as DAPA implicates state “sovereignty concerns.” Majority Op. at 151, 153. Within this framework of standing, Texas has demonstrated an injury-in-fact because “it would incur significant costs in issuing driver’s licenses to DAPA beneficiaries.” Id. at 154. The majority contends that even though “Texas could avoid financial loss by requiring applicants to pay the full costs of licenses, it could not avoid injury *193 altogether” because “avoid[ing] injury by incurring other costs does not negate standing.” Id. at 156. Second, the majority determines that this action is renewable under the APA even though DAPA helps set “priority levels” for immigration enforcement, suggesting that it “is a presumptively unreviewable exercise of ‘pros-ecutorial discretion.’ ” Id. at 166. Despite this, the majority claims that DAPA is reviewable because it “affirmatively con-ferís] ‘lawful presence’ and associated benefits.” Id. While reaching this conclusion the majority also casts doubt on the validity of one of these benefits — a decades-old regulation on employment authorization, previously unchallenged in this suit. See id. at 168-69. Third, recognizing that the “DAPA Memo facially purports to confer discretion,” id. at 171, the majority nonetheless deems the DAPA Memorandum a substantive rule subject to the requirements of notice-and-comment rulemaking, id. at 171-78. According to the majority, the district court’s conclusion — that “[n]othing about DAPA ‘genuinely leaves the agency and its [employees] free to exercise discretion,’” Dist. Ct. Op., 86 F.Supp.3d at 670 — is not clearly erroneous, as there was at least “conflicting evidence on the degree to which DACA allowed for discretion.” Majority Op. at 175 (emphasis added). Finally, the majority reaches beyond the district court’s judgment to conclude that DAPA constitutes a substantive violation of the APA because it “is not authorized by statute.” Id. at 184. I address each of these conclusions in turn.
II. Standing
While I would conclude that this case is non-justiciable, I write first to note my concerns with the majority’s primary theory of standing, premised on an expansive notion of state standing and Texas’s increased costs due to the issuance of driver’s licenses to DAPA recipients.
Building off a single, isolated phrase in Massachusetts v. EPA, 549 U.S. 497, 520, 127 S.Ct. 1438, 167 L.Ed.2d 248 (2007), the majority finds that Texas has “special solicitude” in the standing inquiry because “DAPA affects the states’ ‘quasi-sovereign’ interests.” Majority Op. at 153. It is altogether unclear whether the majority means that states are afforded a relaxed standing inquiry by virtue of their statehood or whether their statehood, in of itself, helps confer standing. In any event, both propositions are deeply troublesome for three reasons.
First, this reasoning misconstrues the holding of Massachusetts. In that case, the Supreme Court held that Massachusetts had standing to challenge the EPA’s decision not to regulate greenhouse gas emissions. Massachusetts, 549 U.S. at 526, 127 S.Ct. 1438. But it did so based on Massachusetts’ quasi-sovereign interests and a provision of the Clean Air Act that specifically “recognized a concomitant procedural right to challenge the rejection of its rulemaking petition as arbitrary and capricious.” Id. at 520, 127 S.Ct. 1438 (citing 42 U.S.C. § 7607(b)(1)). The Court there recognized that this statutory “authorization [was] of critical importance to the standing inquiry.” Id. at 516, 127 S.Ct. 1438. By contrast, neither the INA nor the APA specifically authorizes this suit.[13] Massachusetts also provides little *194 instruction as to how far this “special solicitude” reaches. The phrase appears only once in the Massachusetts majority opinion. And the Court has had no occasion to revisit it since.[14]
Second, the majority’s ruling raises serious separation of powers concerns. Long recognized is “the foundational role that Article III standing plays in our separation of powers.” Ariz. Christian Sch. Tuition Org. v. Winn, 563 U.S. 125, 131 S.Ct. 1436, 1443, 179 L.Ed.2d 523 (2011); see also Steel Co. v. Citizens for a Better Env’t, 523 U.S. 83, 125 n. 20, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) (“[OJur standing doctrine is rooted in separation-of-powers concerns.”). By preserving the proper bounds of Article III standing, the judiciary prevents itself from “aggrandizing] itself ... at the expense of one of the other branches.” John G. Roberts, Jr., Article III Limits on Statutory Standing, 42 Duke L.J. 1219, 1230 (1993).
The majority’s breathtaking expansion of state standing would inject the courts into far more federal-state disputes and review of the political branches than is now the case. While the majority claims that the factors giving a state “special solicitude” to sue the federal government will “seldom exist,” its holding suggests otherwise. Majority Op. at 162. If the APA provides the requisite procedural right to file suit — as the majority indicates, see id. at 151 — and a state need only assert a “quasi-sovereign interest” to get “special solicitude,” then states can presumably challenge a wide array of federal regulatory actions. The majority dismisses such a possibility as a “parade of horribles” and “unfounded” based on the lack of such lawsuits at the moment. Id. at 162. It is certainly possible to describe a parade of horribles that could result from the majority’s decision, but those horribles are only “unfounded” because the majority’s broad ruling is untested and unparalleled in any other court.[15] By relaxing standing for *195 state suits against the federal government, we risk transforming ourselves into “ombudsmen of the administrative bureaucracy, a role for which [we] are ill-suited both institutionally and as a matter of democratic theory.” Roberts, supra, at 1232.
Third, and relatedly, the majority’s sweeping “special solicitude” analysis “has no principled limit.” Majority Op. at 160. Recognizing that fact, it “stress[es] that [its] decision is limited to these facts.” Id. at 154. Really? If that were true, there would be no need to assuage concerns regarding the opinion’s breadth by arguing “that there are other ways to cabin policy disagreements masquerading as legal claims.” Id. at 161. It is hard for me to see the bounds of the majority’s broad ruling. Circuit Judge Alvin B. Rubin of this court once wrote that “[a]ny appellate opinion worth publishing should not merely give a reasoned disposition of the particular matter; it should, in addition, articulate a standard or a rule that can be applied by lawyers and judges in future cases.” Alvin B. Rubin, Views From the Lower Court, 23 UCLA L. Rev. 448, 451 (1976). Anything else is a “ ‘railway ticket’ decision — good only for this day and station.” Id. Today’s decision is either just such a “railway ticket” (which, we are told, it actually aspires to be) or a broad, newfangled concept of state standing with little instruction going forward.
Apart from its “special solicitude” analysis, the majority also holds that Texas has standing because it suffered an injury-in-fact traceable to DAPA. This injury results from two independent decisions made by Texas: (1) an alleged decision to underwrite the costs of issuing driver’s licenses to all applicants; and (2) a decision to allow deferred action recipients to apply for driver’s licenses. The majority claims, at length, that there is a “pressure to change state law,” Majority Op. at 153, because the DAPA Memorandum has the downstream effect of expanding the pool of potential Texas driver’s license applicants, thus increasing the costs Texas has made the choice to bear. This “pressure” is entirely manufactured by Plaintiffs for this case, and the majority and the district court have signed on. Nothing in the DAPA Memorandum suggests changes in state law. And I am skeptical that an incidental increase in state costs is sufficient to confer standing for the purposes of Article III. See Pennsylvania v. New Jersey, 426 U.S. 660, 664, 96 S.Ct. 2333, 49 L.Ed.2d 124 (1976) (“No State can be heard to complain about damage inflicted by its own hand.”). But see Wyoming v. Oklahoma, 502 U.S. 437, 448, 112 S.Ct. 789, 117 L.Ed.2d 1 (1992) (holding a state had standing to sue another state when it suffered “a direct injury in the form of a loss of specific tax revenues”).[16] Such a *196 theory of standing — based on the indirect economic effects of agency action — could theoretically bestow upon states standing to challenge any number of federal programs as well (assuming states have the motivation to create the factual record to support those economic effects). I have serious misgivings about any theory of standing that appears to allow limitless state intrusion into exclusively federal matters — effectively enabling the states, through the courts, to second-guess federal policy decisions — especially when, as here, those decisions involve prosecutorial discretion. See AIRC, 135 S.Ct. at 2665 n.12 (“The Court’s standing analysis ... has been ‘especially rigorous when reaching the merits of the dispute would force [the Court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional.’ ”) (quoting Raines v. Byrd, 521 U.S. 811, 819-20, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997)).
III. Justiciability
I would conclude, as did Judge Higgin-son in dissenting from the denial of a stay in.this action, that this case is non-justicia-ble. I write only to supplement Judge Higginson’s thorough and forceful analysis as to this issue, with which I agree in full. See generally Texas v. United States, 787 F.3d 733, 769-84 (5th Cir.2015) (Higginson, J., dissenting).
Plaintiffs concede that if the DAPA Memorandum is only an exercise in enforcement discretion — without granting any “additional benefits” — it is unreviewable under 5 U.S.C. § 701(a).[17] See Majority Op. at 178 n. 156 (recognizing that “a nonenforcement policy ... presumptively would be committed to agency discretion”); see also Heckler v. Chaney, 470 U.S. 821, 831, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985) (“[A]n agency’s decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency’s absolute discretion.”); Texas v. United States, 106 F.3d 661, 667 (5th Cir.1997) (“An agency’s decision not to take enforcement actions is unreviewable.... ”). Even the district court concluded that “decisions as to how to marshal DHS resources, how to best utilize DHS manpower, and where to concentrate its activities are discretionary decisions solely within the purview of the Executive Branch.” Dist. Ct. Op., 86 F.Supp.3d at 645. But those are exactly the type of decisions the DAPA Memorandum contemplates. The Memorandum is a statement embodying the Secretary’s tentative decision, based on an assessment of the best uses of DHS’s limited resources and under his congressionally delegated authority to “[e]stablish[ ] national immigration enforcement policies and priorities,” 6 U.S.C. § 202(5), not to remove qualifying applicants for a certain period of time.
In other words, deferred action itself is merely a brand of “presumptively unre-viewable” prosecutorial discretion. Majority Op. at 166; see 8 C.F.R. § 274a.l2(c)(14) (describing “deferred action” as “an act of administrative convenience to the government which gives some cases lower priority”); see also Reno, 525 U.S. at 483-84, 119 S.Ct. 936 (“At each stage [of the removal process] the Executive has discretion to abandon the endeav- or, [including by] engaging in a regular *197 practice (which had come to be known as ‘deferred action’) of exercising that discretion for humanitarian reasons or simply for its own convenience.”); Villas at Parkside Partners v. City of Farmers Branch, 726 F.3d 524, 545 n.3 (5th Cir.2013) (en banc) (Dennis, J., concurring) (describing DACA as an “exercise of ... prosecutorial discretion”); Arpaio, 797 F.3d at 17 (“One form of discretion the Secretary of Homeland Security exercises is ‘deferred action,’ which entails temporarily postponing the removal of individuals unlawfully present in the United States.”); 6 Charles Gordon et al., Immigration Law & Procedure § 72.03[2][h] (2014) (“To ameliorate a harsh and unjust outcome, the immigration agency may decline to institute proceedings, may terminate proceedings, or may decline to execute a final order of deportation. This commendable exercise in administrative discretion ... is now designated as deferred action.”); Steel on Immigration Law § 14:42 (2014) (defining “deferred action” as the exercise of “discretionary authority by Immigration and Customs Enforcement, before or after a removal proceeding, not to remove the alien”). Much like pretrial diversion in the criminal context — which also developed over a period of decades without express statutory authorization — deferred action channels limited resources by allowing certain low-priority offenders to work openly and contribute taxes, thus reducing their burden on the system. Notably, such prosecutorial discretion is heightened in the immigration context. See Arizona v. United States, — U.S. -, 132 S.Ct. 2492, 2499, 183 L.Ed.2d 351 (2012) (“A principal feature of the removal system is the broad discretion exercised by immigration officials.”);[18] Reno, 525 U.S. at 490, 119 S.Ct. 936 (stating that concerns of judicial intrusion into enforcement decisions “are greatly magnified in the deportation context”); see also 8 U.S.C. § 1252(g) (stripping courts of jurisdiction “to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien”).
To the extent the exercise of deferred action “trigger[sj” other benefits, those are not new or “associated” benefits contained within the DAPA Memorandum itself. Majority Op. at 166-67.[19] Rather, those benefits are a function of statutes and regulations that were enacted by Congresses and administrations long past— statutes and regulations which, vitally, Plaintiffs do not challenge in this action. The ability to apply for work authorization, the benefit on • which the district court most heavily relied, has been tied to deferred action by a federal regulation since the early 1980s. The most current such regulation, promulgated in 1987, states that “[a]n alien who has been granted deferred action, an act of administrative convenience to the government which gives some cases lower priority,” may apply for work authorization “if the alien establishes an economic necessity for employment.”[20] *198 8 C.F.R. § 274a.l2(c)(14). It is this regulation, not the DAPA Memorandum, which affords those granted deferred action the ability to apply for work authorization. Plaintiffs did not challenge the validity of this regulation,[21] and for good reason — it was promulgated via the notice-and-comment process.[22] The majority nevertheless states that § 274a.l2(c)(14) as applied “to any class of illegal aliens whom DHS declines to remove — is beyond the scope of what the INA can reasonably be interpreted to authorize.” Majority Op. at 169. This broad holding is very damaging to DHS’s immigration enforcement policy, which has operated, from time to time, on a class-wide basis. It stems from a deeply flawed reading of the INA that I discuss below.
Each of the other benefits relied on by the district court and the majority — not one of which is even mentioned on the face of the DAPA Memorandum — results, if at all, from prior statutes and notice-and-comment regulations: (1) the suspension of the accrual of certain time periods for purposes of the INA’s illegal reentry bars;[23] (2) eligibility for certain Social Security and Medicare benefits;[24] and (3) the ability to obtain a Social Security num *199 ber.[25] Like work authorization, these benefits are conferred not by the DAPA Memorandum, but by federal statutes or notice- and-comment regulations that are not being directly challenged in this case. And to the extent there are “state benefits,” Majority Op. at 166, to individuals granted deferred action, those benefits stem from state statutes or regulations, none of which is being challenged here. Accordingly, DAPA itself grants no new rights or benefits. It merely announces guidelines for the granting of deferred action (which may trigger benefits under this framework of preexisting law) in an effort to “encourage [qualifying individuals] to come out of the shadows, submit to background checks, pay fees, apply for work authorization ... and be counted.”[26] Appx. A, at 3. Even absent this announcement, the above benefits would attach to any grant of deferred action.
These tangible benefits aside, the majority concludes that the term “lawful presence” itself constitutes a benefit bestowed by the DAPA Memorandum because it is “a change in designation that confers eligibility for substantial federal and state benefits on a class of otherwise ineligible aliens.” Majority Op. at 168. The majority ascribes some added importance to “lawful presence.” The Memorandum uses the phrase “lawful presence” to describe what deferred action is: “Deferred action ... simply means that, for a specified period of time, an individual is permitted to be lawfully present in the United States.” Appx. A, at 2. As the Memorandum makes clear, “[d]eferred action does not confer any form of legal status in this country, much less citizenship,” and it “may be terminated at any time at the agency’s discretion.” Id. at 2; see also Dhuka, 716 F.3d at 156 (“We conclude that ‘lawful status’ implies a right protected by law, while ‘[lawful presence]’ describes an exercise of discretion by a public official.”); Chaudhry v. Holder, 705 F.3d 289, 292 (7th Cir.2013) (“It is entirely possible for aliens to be lawfully present (ie., in a ‘period of stay authorized by the Attorney General’) even though their lawful status has expired.”). Thus, “lawful presence” does not “conferf] legal status upon its recipients,” Dist. Ct. Op., 86 F.Supp.3d at 637 n. 45 (emphasis added), nor does it constitute “a change in designation,” Majority Op. at 168. Rather, both “lawful presence” and “deferred action” refer to nothing more than DHS’s tentative decision, revocable at any time, not to remove an individual for the time being — i.e., the decision to exercise prosecutorial discretion. Even the majority acknowledges that, at its core, “deferred action [is] a nonprosecution decision.” Id. at 167 (citing Reno, 525 U.S. at 484, 119 S.Ct. 936).[27]
*200 The Memorandum provides guidelines for this exercise of prosecutorial discretion, and thus falls squarely within DHS’s “broad discretion to ‘decide whether it makes sense to pursue removal at all.’ ” Id. at 165; see also Dist. Ct. Op., 86 F.Supp.3d at 645 (noting the Secretary’s “virtually unlimited discretion when prioritizing enforcement objectives and allocating its limited resources”). Accordingly, precedent compels the conclusion that this case is non-justiciable.[28] See Texas, 106 F.3d at 667 (concluding that an “allegation that defendants have failed to enforce the immigration laws ... is not subject to judicial review ... because a court has no workable standard against which to judge the agency’s exercise of discretion”); see also Heckler, 470 U.S. at 831, 105 S.Ct. 1649 (noting “the general unsuitability for judicial review of agency decisions to refuse enforcement”); Johns v. Dep’t of Justice, 653 F.2d 884, 893 (5th Cir.1981) (“Th[e] discretion [to commence deportation proceedings] is, like prosecu-torial discretion, immune from review in the courts.”). That a prior statute or regulation ties a benefit to the exercise of prosecutorial discretion does not make that ordinarily unreviewable exercise of prosecutorial discretion reviewable or turn it into “affirmative agency action.” Majority Op. at 168. Rather, the challenge is properly leveled at the prior legislation that does the tying. See U.S. Dep’t of Labor v. East Metals Corp., 744 F.2d 1145, 1156 (5th Cir.1984) (deeming a rule non-substantive where the rule’s “substantive effect ... is purely derivative” of preexisting statutes and regulations). Plaintiffs’ failure to formally challenge the statutes and regulations discussed above — either through the political process at the time of their enactment or in this litigation — does not change the equation. It is always a risk that a different administration will be more generous with its discretion than the one in place at the time the statutes or regulations are passed. Moreover, that these decisions will likely be made with respect to a large number of individuals, and that DHS seeks to organize the process by memorializing these decisions and notifying applicants of the results, does not transform deferred action into anything other than an exercise of prosecutorial discretion. Rather, as noted above, the scale of this policy is a direct function of Congress’s past appropriations decisions.
Nor can it possibly be maintained that this exercise of prosecutorial discretion may be reviewed because DHS, which has been removing individuals from the United States in record numbers, “ ‘consciously and expressly adopted a general policy’ that is so extreme as to amount to an abdication of its statutory responsibilities.” [29] Heckler, 470 U.S. at 833 n.4, 105 *201 S.Ct. 1649. Although Plaintiffs may prefer a different approach to immigration enforcement, they “do[] not contend that federal defendants are doing nothing to enforce the immigration laws.” Texas, 106 F.3d at 667 (emphasis added). As we have stated, “[r]eal or perceived inadequate enforcement of immigration laws does not constitute a reviewable abdication of duty.” Id.; see also Heckler, 470 U.S. at 834, 105 S.Ct. 1649 (“The danger that agencies may not carry out their delegated powers with sufficient vigor does not necessarily lead to the conclusion that courts are the most appropriate body to police this aspect of their performance.”).
Finally, I would note that characterizing any “associated” benefits as flowing exclusively from the DAPA Memorandum — despite the fact that they stem from separate legal authorities — sets a dangerous precedent. The majority concludes that, in order to be reviewable, “DAPA need not directly confer public benefits”; merely “removing a categorical bar on receipt of those benefits and thereby making a class of persons newly eligible for them ‘provides a focus for judicial review.’ ” Majority Op. at 167. Under this logic, any non-enforcement decision that triggers a collateral benefit somewhere within the background regulatory and statutory scheme is subject to review by the judiciary. As DHS notes, many exercises of prosecutorial discretion trigger such benefits. For example, a prosecutor’s decision to place an individual in a federal pretrial diversion program in lieu of prosecution may result in that individual receiving drug treatment. See Thomas E. Ulrich, Pretrial Diversion in the Federal Court System, Fed. Prob., Dec. 2002 at 30, 32.[30] At the very least, the majority’s reasoning would render reviewable every single exercise of deferred action — programmatic or ad hoc — as any grant of deferred action triggers benefits under the statutes and regulations discussed above. While the district court distinguished away many past exercises of deferred action as “different in kind and scope” from DAPA for the purposes of reviewability,[31] Dist. Ct. Op., 86 F.Supp.3d at 664, the majority does not cabin its conclusion. In fact, it suggests that all exercises of deferred action would be subject to judicial scrutiny. Majority Op. at 166 (“Deferred action ... is much more than nonenforcement.”).
This is logic to which I cannot subscribe. Because the DAPA Memorandum contains only guidelines for the exercise of prosecu-torial discretion and does not itself confer any benefits to DAPA recipients, I would deem this case non-justiciable. The policy decisions at issue in this case are best resolved not by judicial fiat, but via the political process. That this case essentially boils down to a policy dispute is underscored not only by the dozens of amicus briefs filed in this case by interested par *202 ties across the ideological spectrum — Mayors, Senators, Representatives, and law enforcement officials, among others — but also by the district court’s opinion, which repeatedly expresses frustration that the Secretary is “actively act[ing] to thwart” the immigration laws and “is not just rewriting the laws [but is] creating them from scratch.” Dist. Ct. Op., 86 F.Supp.3d at 668. The majority’s observation that this suit involves “policy disagreements masquerading as legal claims” is also telling. Majority Op. at 161. Whether or not the district court’s characterization of this case is accurate — though the record number of removals in recent years demonstrates that it is not — to the extent some are unhappy with the vigor of DHS’s enforcement efforts, their remedies lie in the political process, not in litigation. See Mathews v. Diaz, 426 U.S. 67, 81, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976) (“For reasons long recognized as valid, the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government.”). Congress is free to constrain DHS’s discretion, and, ultimately, the voters are free to express their approval or disapproval of DAPA through their choice of elected officials. See Lincoln v. Vigil, 508 U.S. 182, 193, 113 S.Ct. 2024, 124 L.Ed.2d 101 (1993) (“[W]e hardly need to note that an agency’s decision to ignore congressional expectations may expose it to grave political consequences.”).
Accordingly, this case should be dismissed on justiciability grounds. However, for the sake of thoroughness and to correct serious errors committed by the district court in granting the preliminary injunction and the majority in affirming that grant, I discuss below the merits of both APA claims.
IV. APA Procedural Claim
Our precedent is clear: “As long as the agency remains free to consider the individual facts in the various cases that arise, then the agency action in question has not established a binding norm,” and thus need not go through the procedures of notice-and-comment. Prof'ls & Patients for Customized Care v. Shalala, 56 F.3d 592, 596-97 (5th Cir.1995) (citation omitted).[32] Therefore, in order for Plaintiffs to establish a substantial likelihood of success on the merits — the required showing for a preliminary injunction, Jackson Women’s Health Org. v. Currier, 760 F.3d 448, 452 (5th Cir.2014) — Plaintiffs bore the burden of demonstrating that the Memorandum was non-discretionary. As the majority admits, the Memorandum “facially purports to confer discretion.” Majority Op. at 171. But the district court ignored this clear language, concluding that agency officials implementing DAPA will defy the *203 Memorandum and simply rubberstamp applications. In so doing, the district court disregarded a mountain of highly probative evidence from DHS officials charged with implementing DAPA, relying instead on selected excerpts of the President’s public statements, facts relating to a program materially distinguishable from the one at issue here, and improper burden-shifting. The majority now adopts the district court’s conclusions wholesale and without question. Id. at 175. For the reasons set out below, I would hold that the Memorandum is nothing more than a general statement of policy and that the district court’s findings cannot stand, even under clear error review.
A. The Language and Substance of the DAPA Memorandum
In determining whether the DAPA Memorandum constitutes a substantive rule, we must begin with the words of the Memorandum itself. See Prof'ls & Patients, 56 F.3d at 596. The Memorandum states that it reflects “new policies,” Appx. A, at 1, and “guidance for case-by-case use of deferred action,” Appx. A, at 3. Accordingly, the Secretary characterizes the Memorandum as a “general statement ] of policy” — which is not subject to the notice- and-comment process. . 5 U.S.C. § 553(b)(3)(A); see also Prof'ls & Patients, 56 F.3d at 596 (“[T]he description as ‘policy’ in the [statement] itself ... militate[s] in favor of a holding that [the statement] is not a substantive rule.”). The Memorandum also repeatedly references (more than ten times) the discretionary, “case-by-case” determinations to be made by agents in deciding whether to grant deferred action. It emphasizes that, despite the criteria contained therein, “the ultimate judgment as to whether an immigrant is granted deferred action will be determined on a case-by-case basis.”[33] Appx. A, at 5; see also Ass’n of Flight Attendants-CWA v. Huerta, 785 F.3d 710, 717 (D.C.Cir.2015) (stating that a document “riddled with caveats is not” likely to constitute a substantive rule); Brock v. Cathedral Bluffs Shale Oil Co., 796 F.2d 533, 538 (D.C.Cir.1986) (Scalia, J.) (concluding that agency guidelines for determining when to take enforcement action against mine operators did not constitute a substantive rule where “[t]he language of the guidelines is replete with indications that the Secretary retained his discretion to cite production-operators as he saw fit”). Indeed, this court has, already recognized the “discretion expressly granted under” DAPA — discretion that allows *204 “agent[s] to deal with each alien on a case by case basis.” Crane v. Johnson, 788 F.3d 244, 255 (5th Cir.2015) (concluding that, on the record in Crane, the plaintiffs lacked standing to challenge DACA).
The discretionary nature of the DAPA Memorandum is further supported by the policy’s substance. Although some of the Memorandum’s criteria can be routinely applied,[34] many will require agents to make discretionary judgments as to the application of the respective criteria to the facts of a particular case. For example, agents must determine whether an applicant “pose[s] a danger to national security,” Appx. B, at 3, whether the applicant is “a threat to ... border security” or “public safety,” Appx. B, at 4, and whether the applicant has “significantly abused the visa or visa waiver programs,”[35] Appx. B, at 4. Such criteria cannot be mechanically applied, but rather entail a degree of judgment; in other words, they are “imprecise and discretionary — not exact and certain.” [36] Prof'ls & Patients, 56 F.3d at 600 (concluding that an FDA policy delineating nine factors the agency should consider in determining whether to bring an enforcement action did not constitute a substantive rule). This aspect of the DAPA Memorandum appears to have been overlooked by the district court, which — in analyzing whether the Memorandum allows for case-by-case discretion — was fixated on the extent to which applicants meeting DAPA’s criteria would nonetheless be denied deferred action.[37] Such an approach ignores the fact that applying these threshold criteria itself involves an exercise of discretion.
Most strikingly, the last criterion contained in the DAPA Memorandum is entirely open-ended, stating that deferred action should be granted only if the applicant “present[s] no other factors that, in the exercise of discretion, makes the grant of deferred action inappropriate.” Appx. A, at 4. The Memorandum does not elaborate on what such “other factors” should be considered — leaving this analysis entirely to the judgment of the agents processing the applications. This court has held that such a caveat “express[ing] that [a] list of ... factors is neither dispositive nor exhaustive,” “clearly leaves to the sound discretion of the agency in each case the ultimate decision whether to bring an enforcement action.” Prof'ls & Patients, 56 F.3d at 600-01. Indeed, construing the DAPA memorandum as a categorical grant of deferred action for all applicants meeting the other DAPA criteria would render this last criterion meaningless. Cf. Brock, 796 F.2d at 538. Thus, due to the pres *205 ence of these various flexible and indefinite criteria, the DAPA Memorandum is not a substantive rule that “so fills out the statutory scheme, that upon application one need only determine whether a given case is within the rule’s criterion.” Huerta, 785 F.3d at 718 (citation omitted); cf. Pickus v. U.S. Bd. of Parole, 507 F.2d 1107, 1113 (D.C.Cir.1974) (concluding that the “formula like” guidance for determining the length of parole constituted a substantive rule, as it involved the “purely mechanical operation” of computing a score using exclusive criteria).
As Judge Kavanaugh, writing for the D.C. Circuit, has stated, “[t]he most important factor” in distinguishing between a substantive rule and a general statement of policy “concerns the actual legal effect (or lack thereof) of the agency action in question on regulated entities.” Nat’l Mining Ass’n v. McCarthy, 758 F.3d 243, 252 (D.C.Cir.2014). Here, the Memorandum makes clear that it “confers no substantive right, immigration status or pathway to citizenship.” Appx. A, at 5. The majority suggests that DAPA “modifies substantive rights and interests,” by “conferring lawful presence on 500,000 illegal aliens” and forcing Texas to change its laws. Majority Op. at 175-76. None of this appears on the face of the Memorandum though.[38] In fact, nothing in the Memorandum indicates that it is legally binding — i.e., that an applicant who is not granted deferred action can challenge that decision in court, or that DHS would be barred from removing an applicant who appears to satisfy the Memorandum’s criteria. See Tex. Sav. & Cmty. Bankers Ass’n v. Fed. Hous. Fin. Bd., 201 F.3d 551, 556 (5th Cir.2000) (“Substantive or legislative rules affect individual rights and obligations and are binding on the courts.”); cf. Cmty. Nutrition Inst. v. Young, 818 F.2d 943, 948 (D.C.Cir.1987) (per curiam) (deeming enforcement criteria a substantive rule where, “[a]s FDA conceded at oral argument, it would be daunting indeed to try to convince a court that the agency could appropriately prosecute a producer [who did not meet the agency’s criteria for enforcement]”). Nor does anyone assert that the Memorandum “impose[s] any obligation or prohibition on regulated entities,” i.e., the potential DAPA applicants.[39] Huerta, 785 F.3d at 717; cf. Heckler, 470 U.S. at 832, 105 S.Ct. 1649 (“[W]hen an agency refuses to act it generally does not exercise its coercive power over an individual’s liberty or property rights, and thus does not infringe upon areas that courts often are called upon to protect.”). Moreover, even absent the DAPA Memorandum, DHS would have the authority to take the action of which Plaintiffs complain — i.e., by granting deferred action on an ad hoc basis. See McCarthy, 758 F.3d at 253 (“When the agency applies a general statement of policy in a particular situation, it must be prepared to support the policy just as if the policy, statement had never been issued.” (internal brackets omitted)). Accordingly, based on its language and substance, the Memorandum does not constitute a binding substantive rule subject to the requirements of notiee- and-comment.
*206 The majority recognizes that the plain language of Memorandum “facially purports to confer discretion” and does not argue that DAPA creates a substantive rule from its four corners alone. Majority Op. at 171. Nonetheless, the district court reached the opposite conclusion. And it bears identifying the errors committed by the district court in holding that DAPA was a substantive rale on its face.
The district court focused on the Memorandum’s “mandatory • term[s], instruetion[s], [and] command[s]” — in particular, the Secretary’s “direction]” to USCIS to begin implementing DAPA. Dist. Ct. Op., 86 F.Supp.3d at 671 n. 103. But it should be no surprise that the Memorandum “direct[s]” the USCIS to establish a process for implementing this guidance, Appx. A, at 4; certainly the Secretary did not intend for it to be ignored, see Prof'ls & Patients, 56 F.3d at 599 (“[W]hat purpose would an agency’s statement of policy serve if agency employees could not refer to it for guidance?”). Although “the mandatory tone of the factors is undoubtedly calculated to encourage compliance,” such language does not transform a statement of policy into a substantive rale so long as there is “an opportunity for individualized determinations.” Id. at 597. Our discussion in Professionals and Patients is particularly instructive on this point:
True, the FDA had even greater discretion in bringing enforcement actions before [the policy for determining whether to bring enforcement actions against pharmacies] issued; prior to that time inspectors were apparently provided with no official guidance whatsoever. In that sense, therefore, [the policy] has “channeled” the FDA’s enforcement discretion, providing direction — where once there was none— by helping to determine whether a pharmacy is engaged in traditional compounding or drug manufacturing. But all statements of policy channel discretion to some degree — indeed, that is their purpose. The more cogent question therefore is whether [the policy] is so restrictive in defining which pharmacies are engaged in drug manufacturing that it effectively removes most, if not all, of the FDA’s discretion in deciding against which pharmacies it will bring an enforcement action. We cannot read [the policy] that restrictively.
Id. at 600. Nor should the DAPA Memorandum be read so restrictively. Its channeling of agency enforcement discretion — through the use of non-exhaustive, flexible criteria — is entirely consistent with a non-substantive rule. See, e.g., Nat’l Roofing Contractors Ass’n v. U.S. Dep’t of Labor, 639 F.3d 339, 341-42 (7th Cir.2011) (“The Secretary committed to paper the criteria for allowing regulatory violations to exist without redress, a step essential to control her many subordinates. This does not make the exercise less discretionary.”); Guardian Fed. Sav. & Loan Ass’n v. Fed. Sav. & Loan Ins. Corp., 589 F.2d 658, 667 (D.C.Cir.1978) (“The mandatory tone of the specifications for audits and auditors doubtless encourages compliance. However, an opportunity for an individualized determination is afforded.”); see also Kast Metals Corp., 744 F.2d at 1152 n.13 (“[A]gency instructions to agency officers are not legislative rules.”). This is the law for good reason. Requiring each and every policy channeling prosecutorial discretion to go through the notice-and-comment process would perversely encourage unwritten, arbitrary enforcement policies.
The plain language of the Memorandum cannot be characterized as “drawing] a ‘line in the sand’ that, once crossed, removes all discretion from the agency.” Prof'ls & Patients, 56 F.3d at 601. Furthermore, the fact that the DAPA Memo *207 randum relates to two areas in which courts should be reluctant to interfere— immigration and prosecutorial discretion— counsels in favor of concluding that it does not constitute a substantive rule. See Brock, 796 F.2d at 538 (“Our decision [that the rule is non-substantive] is reinforced by the fact that the statement here in question pertains to an agency’s exercise of its enforcement discretion — an area in which the courts have traditionally been most reluctant to interfere.”).
Rather than relying on the language of the Memorandum, the majority concludes that DAPA is a substantive rule because it “would not genuinely leave [DHS] and its employees free to exercise discretion” in practice. Majority Op. at 175; see also Prof'Ls & Patients, 56 F.3d at 595 (quoting Young, 818 F.2d at 946). But in doing so, the majority relies unquestioningly on the district court’s finding that the discretionary language in DAPA was “merely pretext” and that DHS officials would not exercise case-by-case discretion of removals under DAPA. Majority Op. at 171; see also id. at 177 (“DAPA establishes ‘the substantive standards by which the [agency] evaluates applications.’ ” (alterations in original)). The district court’s finding was clearly erroneous, however, and I turn to it next.
B. Evidence of Pretext
The district court erred not only in its analysis of the legal effect of the DAPA Memorandum, but also in its resolution of the facts. By eschewing the plain language of the Memorandum, and concluding that its discretionary aspects are “merely pretext,” Dist. Ct. Op., 86 F.Supp.3d at 669 n. 101, the district court committed reversible error. To the extent the district court’s pretext conclusion constitutes a factual finding entitled to “clear error” review, that does not mean that we “rubber stamp the district court’s findings- simply because they were entered.” McLennan v. Am. Eurocopter Corp., 245 F.3d 403, 409 (5th Cir.2001). Rather, “[c]lear error exists when this court is left with the definite and firm conviction that a mistake has been made.” Ogden v. Comm’r, 244 F.3d 970, 971 (5th Cir.2001) (per curiam). I am left with such a conviction for three independent reasons: (1) the record lacks any probative evidence of DAPA’s implementation; (2) the district court erroneously equated DAPA with DACA; and (3) even assuming DAPA and DACA can be equated, the evidence of DACA’s implementation fails to establish pretext.
It is true that the plain language of the Memorandum — which, in the majority’s words, “facially purports to confer discretion” — may not be conclusive if rebutted by “what the agency does in fact.” Prof'ls & Patients, 56 F.3d at 596. Here, however, there is no such evidence of what the agency has done “in fact,” as DAPA has yet to be implemented. The district court ruled even before it had “an early snapshot” of the policy’s implementation. McCarthy, 758 F.3d at 253 (stating that, “because ... recently issued guidance will have been implemented in only a few instances,” courts “looking] to post-guidance events to determine whether the agency has applied the guidance as if it were binding” must rely on “an early snapshot”).[40] Plaintiffs have cited no authority, *208 and I am not aware of any, deeming a statement of policy pretextual without direct evidence of the policy’s implementation. Cf. Interstate Nat. Gas Ass’n of Am. v. FERC, 285 F.3d 18, 60 (D.C.Cir.2002) (“[I]f there have so far been any applications of the [agency]’s policy, neither side has seen fit to bring it to our attention. So there is no basis here for any claim that the [agency] has actually treated the policy with the de facto inflexibility of a binding norm.”). Nor should pretext be found here absent such evidence. As noted at the outset, courts should not be quick to conclude that when a coordinate branch of government describes a policy as discretionary, it does not mean what it says.
How, then, did the district court reach the conclusion that the DAPA Memorandum’s express inclusion of case-by-case discretion is “merely pretext”? First, the district court selectively relied on public statements the President made in describing the DAPA Memorandum to the public. Majority Op. at 173. But there is no precedent for a court relying on such general pronouncements in determining a program’s effect on the agency and on those being regulated. As Judge Higginson aptly noted in his dissent from the denial of the motion for a stay, “Presidents, like governors and legislators, often describe [a] law enthusiastically yet defend the same law narrowly.” Texas, 787 F.3d at 780 (Higginson, J., dissenting); see also Prof'ls & Patients, 56 F.3d at 599 (reasoning that “informal communications often exhibit a lack of ‘precision of draftsmanship’ and ... internal inconsistencies” and thus are “entitled to limited weight”).[41] More importantly, the statements relied upon by the district court are not inconsistent with the DAPA Memorandum’s grant of discretion to agency decision makers. For example, the President’s statement that those who “meet the [DAPA] criteria ... can come out of the shadows,” Dist. Ct. Op., 86 F.Supp.3d at 668, does not suggest that applications will be rubber-stamped, given that (as discussed above) those very criteria involve the exercise of discretion. Similarly, the President’s suggestion that agents who do not follow DAPA’s guidelines may suffer consequences does not support the conclusion that the Memorandum is pretextual. Rather, it supports the opposite conclusion — that the terms of the DAPA Memorandum, which incorporate case-by-case discretion, will be followed. An order to “use your discretion” is not a substantive rule.
The district court’s reliance on language contained in DHS’s DAPA website — a source apparently not even cited by the parties and not mentioned by the majority — rests on even shakier ground. According to the district court, the DHS website’s characterization of DAPA as a “program” and an “initiative” somehow contradicts DHS’s position that the Memorandum constitutes “guidance.” Of course, DAPA may very well be all three, but this has no bearing on whether the Memorandum constitutes a substantive rule — i.e., whether the “program” or “initiative” or “guidance” genuinely allows the agency to exercise its discretion on a case-by-case basis. Even more dubious is the *209 district court’s argument that, by using the word “initiative” on its website, DHS was intending to use the word in its technical legal sense to reference voter initiatives, thus implying a “legislative process.”[42] Id. at 667-68.
Lacking any probative evidence as to DAPA’s implementation, the district court relied most heavily on evidence of DACA’s implementation — concluding unequivocally that DAPA will be “implemented exactly like DACA.” Id. at 663. It is this analysis that the majority finds convincing, all the while noting that “any extrapolation from DACA must be done carefully.” Majority Op. at 173. The district court reached this conclusion on two flawed bases: (1) the DAPA Memorandum’s statement directing the USCIS to “establish a process, similar to DACA” for implementing DAPA, Appx. A, at 4; and (2) the “lack of any suggestion that DAPA will be implemented in a fashion different from DACA,” Dist. Ct. Op., 86 F.Supp.3d at 649. With respect to the former, this single, nebulous statement does not specify how the DAPA and DACA processes would be similar; the phrase cannot be construed to mean that DAPA and DACA will be implemented identically. The latter is pure burden-shifting — the district court implies that the burden is on DHS to show that the two programs will be implemented differently. Of course, in the preliminary injunction context, Plaintiffs, “by a clear showing, carr[y] the burden of persuasion.” Harris Cnty. v. CarMax Auto Superstores Inc., 177 F.3d 306, 312 (5th Cir.1999). The district court also completely ignored the statement contained in the Declaration' of Donald W. Neufeld — the Associate Director for Service Center Operations for USCIS — that “USCIS is in the process of determining the procedures for reviewing requests under DAPA, and thus USCIS has not yet determined whether the process to adjudicate DAPA requests will be similar to the DACA process.”
More importantly, the fact that the administration of the two programs may be similar is not evidence that the substantive review under both programs will be the same. As discussed in more detail below, the district court relied heavily on the denial rates of applications submitted under DACA. But those rates are irrelevant for one simple reason, a reason the district court failed to confront: the substantive criteria under DACA and DAPA are different. And even the majority concedes that “DACA and DAPA are not identical.” Majority Op. at 173. Review under the DACA Memorandum does not, for example, require reference to the various discretionary factors contained in the Enforcement Priorities Memorandum, nor does DACA contain DAPA’s criterion that the applicant “present no other factors that, in the exercise of discretion, makes the grant of deferred action inappropriate.” Appx. A, at 4; see also Majority Op. at 174 (“Further, the DAPA Memo contains additional discretionary criteria.”). Thus, even assuming DACA and DAPA applications are reviewed using the exact same administrative process, the district court had no basis for concluding that the results of that process — a process that would involve the application of markedly different, discretionary criteria — would be *210 the same. For this reason alone — that is, the district court’s heavy reliance upon this minimally probative evidence — I would conclude that the district court clearly erred.[43]
There are additional reasons, however, to discount the DACA-related evidence on which the district court based its decision and which the majority now accepts. First, even assuming DACA’s 5%' denial rate has some probative value, and assuming that rate can be properly characterized as low,[44] a low rate would be unsurprising given the self-selecting nature of the program, as the majority concedes. Majority Op. at 173. It should be expected that only those highly likely to receive deferred action will apply; otherwise, applicants would risk revealing their immigration status and other identifying information to authorities, thereby risking removal (and the loss of a sizeable fee). The majority recognizes this issue but finds that it “is partially mitigated by the finding that ‘the [government has publicly declared thát it will make no attempt to enforce the law against even those who are denied deferred action.’ ” Id. (citing Dist. Ct. Op., 86 F.Supp.3d at 663). But this public declaration, cited by the district court, comes from an informational DHS website that never states that DHS will make no attempt to enforce the law.[45]
The district court also erred in its mis-characterization of a letter written by León Rodríguez, Director of USCIS, to Senator Charles Grassley, suggesting that the top four reasons for DACA denials are:
(1) the applicant used the wrong form; (2) the applicant failed to provide a valid signature; (3) the applicant failed to file or complete Form 1-765 or failed to enclose the fee; and (4) the applicant was below the age of fifteen and thus ineligible to participate in the program.
Dist. Ct. Op., 86 F.Supp.3d at 609. This, however, is not what the letter says. The letter actually states that these were the top four reasons for DACA application rejections, not denials. As made clear in DHS’s Neufeld Declaration, “a DACA request is ‘rejected’ when [it is] determined] upon intake that the [application] has a fatal flaw,” while “[a] DACA request is ‘denied’ when a USCIS adjudicator, on a case-by-case basis, determines that the re-questor has not demonstrated that they satisfy the guidelines for DACA or when an adjudicator determines that deferred action should be denied even though the threshold guidelines are met.” By conflating rejections with denials, the district court suggested that most denials are made for mechanical administrative reasons and thus could not have been discre *211 tionary. But the five percent denial rate does not even take into account these administrative rejections.
The district court also appeared singularly focused on one metric for measuring whether DACA (and by implication, DAPA) is implemented in a discretionary manner. The court insisted that DHS provide: “the number, if any, of requests that were denied even though the applicant met the DACA criteria as set out in Secretary Napolitano’s DACA memorandum.”[46] Id. at 609. In yet another instance of improper burden-shifting, the court reasoned that “[b]ecause the Government could not produce evidence concerning applicants who met the program’s criteria but were denied DACA status, this Court accepts the States’ evidence as correct.” Id. at 609 n.8. But the burden of showing DAPA is non-discretionary was on Plaintiffs — the States — and Plaintiffs provided no evidence as to the number of these denials. Rather, the district court accepted as true Plaintiffs’ bare assertion that there were no such denials, concluding unequivocally that “[n]o DACA application that has met the criteria has been denied based on an exercise of individualized discretion.” Id. at 669 n.101. The district court reached this conclusion in the face of uncontested evidence contained in the Neufeld Declaration that DACA applications “have also been denied on the basis that deferred action was not appropriate for other reasons not expressly set forth in ■ [the] 2012 DACA Memorandum.” The district court also failed to acknowledge the reason DHS did not introduce statistics as to these denials: it had no ability to do so. As stated in the Neufeld Declaration, “[u]ntil very recently, USCIS lacked any ability to automatically track and sort the reasons for DACA denials,” presumably because it had no reason to track such data prior to this litigation. Although this point is undisputed, the district court and now the majority nonetheless fault DHS for failing to provide the information the district court requested. See Majority Op. at 175 (“[T]he government did not provide the number of cases that service-center officials referred to field offices for interviews.”). Yet it was not DHS’s burden to disprove Plaintiffs’ assertions of pretext, nor must DHS (anticipatorily) track data in a way that may be convenient to an adversary in future litigation.
The district court also relied on a four-page declaration by Kenneth Palinkas, President of the National Citizenship and Immigration Services Council (the union representing USCIS employees processing DACA applications), for the proposition that “DACA applications are simply rubberstamped if the applicants meet the necessary criteria.”[47] Dist. Ct. Op., 86 F.Supp.3d at 610. Yet lay witness conclusions are only competent evidence if rationally drawn from facts personally observed. See Fed.R.Evid. 701. Here, Pa-Iinkas’s conclusion was supported only by the fact that DACA applications are routed to “service centers instead of field offices,” and that “USCIS officers in service centers ... do not interview applicants”— a weak basis on which to conclude that DHS’s representations (both to the public and to the courts) are “merely pretext.”[48] *212 See 11A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2949 (3d ed. 2015) (“Preliminary injunctions frequently are denied if the affidavits are too vague or conclusory to demonstrate a clear right to relief under Rule 65.”)- Indeed, Palinkas’s assertions are rebutted — and the step-by-step process for reviewing DACA applications is explained — in the detailed affidavit filed by Donald Neufeld, the head of those very USCIS service centers. Neufeld declares that the service centers “are designed to adjudicate applications, petitions and requests” for various programs “that have higher-volume caseloads.” Neufeld goes on to describe the “multi-step, case-specific process” for reviewing DACA applications: “Once a case arrives at a Service Center, a specially trained USCIS adjudicator is assigned to determine whether the requestor satisfies the DACA guidelines and ultimately determine whether a request should be approved or denied.”'[49] Adjudicators “evaluate the evidence each requestor submits in conjunction with the relevant DACA guidelines” and “assess the appropriate weight to accord such evidence.”[50] Citing various examples, Neu-feld explains that “[e]ven if it is determined that a requestor has satisfied the threshold DACA guidelines, USCIS may exercise discretion to deny a request where other factors make the grant of deferred action inappropriate.”[51] As a part of their review, adjudicators can investigate the facts and evidence supporting the application “by contacting educational institutions, other government agencies, employers, or other entities.” Moreover, although the Palinkas Declaration accurately states that adjudicators at USCIS service centers do not have the capability to interview applicants, the Neufeld Declaration clarifies that service center adjudicators “may refer a case for interview at a Field Office” — for example, “when the adjudicator determines, after careful review of the request and supporting documents, that a request is deniable, but potentially curable, with information that can best be received through an interview.” Adjudicators may also request that applicants submit additional evidence in support of their applications for deferred action; this was no rare occurrence, as nearly 200,000 such requests for additional evidence were issued by adjudicators. “In addition, all DACA request-ors must submit to background checks, and requests are denied if these background checks show that deferred action would be inappropriate.”
Placing these declarations side-by-side, the detailed Neufeld Declaration does not simply rebut the conclusory assertions contained in the Palinkas Declaration — it provides undisputed context for how US-CIS service centers actually work and how DACA application decisions are made. Or at the very least, as the majority concedes, the two in tandem create “conflicting evidence on the degree to which DACA allowed for discretion.” Majority Op. at 175. *213 Yet the district court concluded that the Neufeld Declaration did not provide “the level of detail that the Court requested.”[52] Dist. Ct. Op., 86 F.Supp.3d at 609. It is difficult to imagine what level of detail would have satisfied the district court. At a minimum, as recognized by Judge Higginson in his dissent to the denial of the stay pending appeal, the Neufeld Declaration created a factual dispute warranting an evidentiary hearing.[53] See Texas, 787 F.3d at 781-82 (Higginson, J., dissenting) (citing authorities); see also Landmark Land Co. v. Office of Thrift Supervision, 990 F.2d 807, 812 (5th Cir.1993) (“The record reveals several disputes of material fact that the district court must necessarily resolve in deciding whether to issue the injunction. An evidentiary hearing thus is in order upon remand.”); Marshall Durbin Farms, Inc. v. Nat’l Farmers Org., Inc., 446 F.2d 353, 356 n. 4 (5th Cir.1971) (“[Wjhere so very much turns upon an accurate presentation of numerous facts ... the propriety of proceeding upon affidavits becomes the most questionable.”); Cobell v. Norton, 391 F.3d 251, 261 (D.C.Cir.2004) (“Particularly when a court must make credibility determinations to resolve key factual disputes in favor of the moving party, it is an abuse of discretion for the court to settle the question on the basis of documents alone, without an evidentiary hearing.” (emphasis added)). The district court’s failure to hold an evidentiary hearing further undermines faith in its factual conclusions.
The district court also looked to the operating procedures governing the implementation of DACA, noting that they “contain[ ] nearly 150 pages of specific instructions for granting or denying deferred action” and involve the use of standardized forms for recording denials — a fact the majority mentions. Dist. Ct. Op., 86 F.Supp.3d at 669 (footnote omitted). But no such operating procedures for the implementation of DAPA appear in the record — a fact the majority does not mention. As noted above, the USCIS is currently “in the process of determining the procedures for reviewing requests under DAPA.” In any event, even “specific and detailed requirements” may qualify as a “ ‘general’ statement of policy.” Guardian Fed. Sav. & Loan Ass’n, 589 F.2d at 667. And the “purpose” of a statement of policy is to “channel discretion” of agency decision makers; such channeling does not trigger the requirements of notice-and-eomment unless it is “so restrictive ... that it effectively removes most, if not all, of the [agencyj’s discretion.” Prof'ls & Patients, 56 F.3d at 600. As for the use of standardized forms to record denials, what matters is not whether DAPA decisions are memorialized in a mechanical fashion, but whether they are made in such a fashion. For the many reasons discussed above, the district court had no legitimate basis for concluding that they will be.
Finally, the district court’s lengthy discussion of an “abdication theory” of standing' — -a theory for which Plaintiffs have not even expressly advocated — provides context for the district court’s conclusions as to pretext.[54] In determining that the *214 DAPA Memorandum constituted an “abdication” of DHS’s duties, the district court asserted (repeatedly) that it “cannot be disputed” that “the Government has abandoned its duty to enforce the law.” Dist. Ct. Op., 86 F.Supp.3d at 638. The district court deemed it “evident that the Government has determined that it will not enforce the law as it applies to over 40% of the illegal alien population that qualify for DAPA.”[55] Id. at 639 (emphasis added). Such blanket assertions — made without discussing any of the evidence set out above — assume a lack of discretion in the review of DAPÁ applications. This assumption — which the district court apparently required DHS to rebut — infects the opinion below, yet has no evidentiary basis.
The majority accepts the district court’s factual conclusions almost carte blanche. But clear error review is not a rubber stamp, and the litany of errors committed by the district court become readily apparent from a review of the record. The record before us, when read properly, shows that DAPA is merely a general statement of policy. As such, it is exempt from the notice-and-comment requirements of 5 U.S.C. § 553.
V. APA Substantive Claim
The majority’s conclusion that the states are substantially likely to succeed on their APA procedural claim should presumably be enough to affirm the decision below. Yet, for reasons altogether unclear, the majority stretches beyond the judgment of the district court and concludes that DAPA and a long, preexisting regulation (8 C.F.R. § 274a.l2(c)(14)), as applied to DAPA, are substantive APA violations. See Majority Op. at 178-86. Prudence and judicial economy warrant against going this far, and I would not reach this issue on the record before us. For one, “the district court enjoined DAPA solely on the basis of the procedural APA claim.” Id. at 178. It did not evaluate the substantive APA claim at issue. See Dist. Ct. Op., 86 F.Supp.3d at 677 (“[T]he Court is specifically not addressing Plaintiffs’ likelihood of success on their substantive APA claim.”). In fact, the district court eschewed determination of this issue and Plaintiffs’ constitutional claim “until there [could be] further development of the record.” M[56]
*215 On appeal, the parties offered only-sparse arguments on the substantive APA claim. The parties filed briefs totaling 203 pages, of which ten pages addressed the substantive APA claim.[57] This hardly seems to be enough to help us .answer a complicated question of statutory interpretation and administrative law. I would not address the substantive APA claim in light of this limited record while cognizant of the principle that “[c]ases are to be decided on the narrowest legal grounds available.” Korioth v. Briscoe, 523 F.2d 1271, 1275 (5th Cir.1975).
That said, were I to reach the substantive APA claim I would find the majority’s conclusion unpersuasive on the limited record before us. The argument that DAPA is a substantive APA violation, as I read it, appears to be the following: (1) DAPA is “manifestly contrary,” Majority Op. at 186, to the text of the INA and deserves no deference partly because Congress would not assign it such a “decision[] of vast ‘economic and political significance,’ ” id. at 184 (citation omitted); and (2) even if DHS deserved deference, DAPA is not a reasonable interpretation of the INA.
Questions of how agencies construe their governing statutes fall under the two-step inquiry announced in Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). It bears reiterating this framework as I believe the majority misapplies it and its associated precedents. At step one of Chevron, courts are to look at “whether Congress has directly spoken to the precise question at issue.” Id. at 842, 104 S.Ct. 2778. If Congress has directly spoken, then the court “must give effect to [its] unambiguously expressed intent.” Id. at 843, 104 S.Ct. 2778. But “if the statute is silent or ambiguous,” then at step two, a court is to defer to an agency’s interpretation of a statute so long as it is “reasonable.” Id. at 843-44, 104 S.Ct. 2778.
The majority first states that DAPA fails Chevron step one because Congress' has directly addressed the issue of deferred action. Majority Op. at 179-80. To bolster its conclusion, the majority points to provisions of the INA that delineate which aliens can receive lawful permanent resident (LPR) status, can be eligible for deferred action, and can receive LPR status by having a citizen family member. Id. at 179-80. These provisions are, indeed, “specific and detailed,” id. at 179, but none of them precisely prohibits or addresses the kind of deferred action provided for under DAPA. The question under step one is whether the language of a statute is “precisely directed to the question,” not whether “parsing of general terms in the text of the statute will reveal an actual intent of Congress.” Chevron, 467 U.S. at 861-62, 104 S.Ct. 2778. Most of the provisions identified by the majority are directed at the requirements for legal status, not the lawful presence permitted by DAPA. And even the majority acknowledges the two are not the same. See Majority Op. at 180 (“LPR status is more substantial than is lawful presence.”). DAPA does not purport to create “a lawful immigration classification.” Id. at 179.
It is true that Congress has specified certain categories of aliens that are eligible for deferred action. See id. at 179. This line of argument follows from the legal maxim expressio unius est exclusio alteri-us (“the expression of one is the exclusion *216 of others”) suggesting that because DAPA was not specified by Congress, it is contrary to the INA. But this argument is nonetheless incorrect. The expressio uni-us “canon has little force in the administrative setting.” Tex. Rural Legal Aid, Inc. v. Legal Servs. Corp., 940 F.2d 685, 694 (D.C.Cir.1991). And the inquiry at step one is “whether Congress has directly spoken to the precise question at issue,” riot whether it legislated in the general area or around the periphery. Chevron, 467 U.S. at 842, 104 S.Ct. 2778 (emphasis added). Congress has never prohibited or limited ad hoc deferred action, which is no different than DAPA other than scale.[58] In fact, each time Congress spoke to this general issue, it did so incidentally and as part of larger statutes not concerned with deferred action. See, e.g., USA PATRIOT ACT of 2001, Pub L. No. 107-56, § 423(b), 115 Stat. 272, 361 (discussing deferred action for family members of LPRs killed by terrorism within a far larger statute aimed primarily at combatting terrorism). And the language regarding deferred action was worded in permissive terms, not prohibitive terms. See, e.g., 8 U.S.C. § 1154(a)(l)(D)(i)(II) (stating that a qualifying individual “is eligible for deferred action and work authorization”). More importantly, in enacting these provisos, Congress was legislating against a backdrop of longstanding practice of federal immigration officials exercising ad hoc deferred action. By the time Congress specified categories of aliens eligible for deferred action, immigration officials were already “engaging in a regular practice ... of exercising [deferred action] for humanitarian reasons or simply for its own convenience.” Reno, 525 U.S. at 484, 119 S.Ct. 936.[59] Yet Congress did nothing to upset this practice. The provisions cited by the majority, if anything, highlight Congress’s continued acceptance of flexible and discretionary deferred action.[60] Denying DHS’s ability to grant deferred action on a “class-wide basis,” Majority Op. at 164, as the majority does, severely constrains the agency.[61]
*217 The majority makes a similar mistake with respect to the work authorization regulation, 8 C.F.R. § 274a.l2(c)(14). The majority holds that this regulation as “to any class of illegal aliens whom DHS declines to remove — is beyond the scope of what the INA can reasonably be interpreted to authorize.” Majority Op. at 169. It bases its conclusion on provisions of the'. INA that specify classes of aliens eligible and ineligible for work authorization and scattered statements from past cases supposedly stating that Congress restricted immigration to preserve jobs for American workers. Yet, much like with deferred action, Congress has never directly spoken to the question at issue and, if anything, has indirectly approved of it. In one form or another, 8 C.F.R. § 274a.l2(c)(14) has been on the books since 1981. It follows from a grant of discretion to the Secretary to establish work authorizations for aliens, see 8 U.S.C. § 1324a(h)(3), and it predates the INA provisions the majority cites. See Perales v. Casillas, 903 F.2d 1043, 1048 (5th Cir.1990) (noting that up to that point there was “nothing in the [INA] [that] expressly provid[ed] for the grant of employment authorization”). Had Congress wanted to negate this regulation, it presumably would have done so expressly, but by specifying the categories of aliens eligible for work authorization, Congress signaled its implicit approval of this longstanding regulation. Furthermore, no court, until today, has ever east doubt on this regulation. Our own circuit in Pe-rales found no problems with 8 C.F.R. § 274a.l2(c)(14) in concluding that a challenge to employment authorization denials was non-justiciable. Id[62] The majority’s snapshot of Supreme Court opinions discussing the aims of the immigration laws does not speak to this issue and is misleading. Those opinions noted that the immigration laws regarding employment authorization were also concerned with creating an “extensive ‘employment verification system’ ... designed to deny employment to aliens who (a) are not lawfully present in the United States, or (b) are not lawfully authorized to work in the United States.” Hoffman Plastic Compounds, Inc. v. NLRB, 535 U.S. 137, 147, 122 S.Ct. 1275, 152 L.Ed.2d 271 (2002) (citing 8 U.S.C. § 1324a) (emphasis added). DAPA and 8 C.F.R. § 274a.l2(c)(14) further both these aims and also promote the “[s]elf-sufficiency” of aliens by giving them work authorization and making them less reliant on public benefits. See 8 U.S.C. § 1601(1) (“Self-sufficiency has been a basic principle of United States immigration law since this country’s earliest immigration statutes.”).
The majority next holds that DAPA, fails Chevron step one because the INA’s broad grants of authority “cannot reasonably be construed as assigning [DHS] ‘decisions of vast economic and political significance,’ such as DAPA.” Majority Op. at 182-84 (footnote omitted). To the contrary, immigration decisions often have substantial economic and political significance. In Arizona, the Court noted that “discretionary decisions” made in the enforcement of immigration law “involve policy choices that bear on this Nation’s international relations.” 132 S.Ct. at 2499. “Removal decisions,” it has been observed, “ ‘may implicate our relations with foreign powers’ and require consideration of ‘changing political and economic circumstances.’ ” Jama v. Immigration & Customs Enf't, 543 U.S. 335, 348, 125 S.Ct. *218 694, 160 L.Ed.2d 708 (2005) (quoting Mathews v. Diaz, 426 U.S. 67, 81, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976)). And deferred action — whether ad hoe or through DAPA — is not an effort by DHS to “hide elephants in mouseholes,” Whitman v. Am. Trucking Ass’ns, Inc., 531 U.S. 457, 468, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001), but rather “[a] principal feature of the removal system,” Arizona, 132 S.Ct. at 2499.
The majority’s reliance on King v. Burwell, — U.S. -, 135 S.Ct. 2480, 192 L.Ed.2d 483 (2015), for its conclusion is misplaced. The Court in King held that it was unlikely Congress delegated a key reform of the ACA to the IRS — an agency not charged with implementing the ACA and with “no expertise in crafting health insurance policy.” Id. at 2489. By contrast, DHS is tasked with enforcement of the immigration laws, see, e.g., 6 U.S.C. § 202, and its substantial expertise in this area has been noted time and time again. See, e.g., Arizona, 132 S.Ct. at 2506 (“[T]he removal process is entrusted to the discretion of the Federal Government.”).
Lastly, the majority concludes that “[ejven with ‘special deference’ to the Secretary,” DAPA is an unreasonable interpretation of the INA. Majority Op. at 184 (footnote omitted). Reasonableness at step two of Chevron requires only a “minimum level of reasonability,” Tex. Office of Pub. Util. Counsel, 183 F.3d at 420, and will be found so long as an agency’s interpretation is “not patently inconsistent with the statutory scheme,” Am. Airlines, Inc. v. Dep’t of Transp., 202 F.3d 788, 813 (5th Cir.2000) (citation omitted). It is hard to see how DAPA is unreasonable on the record before us. DAPA does not negate or conflict with any provision of the INA. See Whitman, 531 U.S. at 484, 121 S.Ct. 903. DHS has repeatedly asserted its right to engage in deferred action. Cf. FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 146, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000) (concluding an agency was not entitled to deference where it previously disavowed its enforcement authority). And DAPA appears to further DHS’s mission of “[ejstablishing national immigration enforcement policies and priorities.” 6 U.S.C. § 202(5).
Indeed, if DAPA were unreasonable under the INA, then it follows that ad hoc grants of deferred action are unreasonable as well — something the majority declines to reach. See Majority Op. at 186 n. 202. But, as previously mentioned, there is no difference between the two other than scale, and ad hoc deferred action has been repeatedly acknowledged by Congress and the courts as a key feature of immigration enforcement. See Reno, 525 U.S. at 483-84, 119 S.Ct. 936. After all, agencies are “far better equipped than the courts to deal with the many variables involved in the proper ordering of [their] priorities,” Heckler, 470 U.S. at 831-32, 105 S.Ct. 1649 and “[t]he responsibilities for assessing the wisdom of such policy choices ... are not judicial ones,” Chevron, 467 U.S. at 866, 104 S.Ct. 2778. From the limited record before us, I would conclude that the DAPA Memorandum is not a substantive APA violation.
VI. Conclusion
There can be little doubt that Congress’s choices as to the level of funding for immigration enforcement have left DHS with difficult prioritization decisions. But those decisions, which are embodied in the DAPA Memorandum, have been delegated to the Secretary by Congress. Because federal courts should not inject themselves into such matters of prosecutorial discretion, I would dismiss this case as non-justiciable.
Furthermore, the evidence in the record (the importance of which should not be *219 overlooked) makes clear that the injunction cannot stand. A determination of “pretext” on the part of DHS must have a basis in concrete evidence. Of course, as appellate judges, we may not substitute our own view of the facts for that of the district court. But we must also embrace our duty to correct clear errors of fact— that is, to ensure that factual determinations are based not on conjecture, intuition, or preconception, but on evidence. Based on the record as it currently stands, the district court’s conclusion that DAPA applications will not be reviewed on a discretionary, case-by-case basis cannot withstand even the most deferential scrutiny. Today’s opinion preserves this error and, by reaching the substantive APA claim, propounds its own. I have a firm and definite conviction that a mistake has been made. That mistake has been exacerbated by the extended delay that has occurred in deciding this “expedited” appeal. There is no justification for that delay.
I dissent.
*220 [[Image here]]
This memorandum is intended to roiled new policies for the use ofdeferred action. B\ memorandum elated June 15,2012, Swietury NapuliUmo issued guidance entitled kxercrínu’ Prosee moría} Discretion with Respect to hulmchiols Who Came to the United Suites m Children, The following supplements and amends that guidance.
The Depart mem of Homeland Security (DHS) and its immigration components are tesporistlilc for enforcing the Nation's immigration laws. Due to limited resources, DilS and its Components cannot respond in all immigration violations or remove all persons illegal!) in the United Stales. As is tins of virtually every oilier law enforcement agency. DHS mast exercise prosecutorial discretion in ilic enforcement of the law. Secretary Napolitano noted two years.ago. when she issued her prosecutorial discretion guidance regarding children, that "fo'|ur Nation's immigration laws must he enforced in a strong and sensible manner. They are not designed »> be blindly enlbreed «ilhout cans;deration given r« the individual circumstances of each case."
*221 Deferred action is a long-standing administrative mechanism dating back decades, by which the Secretan' of Homeland Security may defer the removal of an undocumented immigrant for a period of time.[1] A form of administrative relief similar to deferred action, known then as "indefinite voluntary departure." was originally authorized by the Reagan and Bush Administrations to defer the deportations of an estimated 1.5 million undocumented spouses and minor children who did not quality for legalization under the Immigration Reform and Control Act of 1986. Known as the “Family Fairness'’ program, the policy was specifically implemented to promote the humane enforcement of the law and ensure family unity.
Deferred action is a form of prosecutorial discretion by which the Secretary deprioritizes an individual's case for humanitarian reasons, administrative convenience, or in the interest of the Department’s overall enforcement mission. As an act of prosecutorial discretion, deferred action is legally available so long as it is granted on a case-by-case basis, and it may be terminated at any time at the agency's discretion. Deferred action does not confer any form oflegal status in this country, much less citizenship; it simply means that, for a specified period of time., an individual is permitted to be lawfully present in the United States. Nor can deferred action itself lead to a green card. Although deferred action is not expressly conferred by statute, the practice is referenced and therefore endorsed by implication in several federal statutes.[2]
Historically, deferred action has been used on behalf of particular individuals, and on a case-by-case basis, for classes of unlawfully present individuals, such as the spouses and minor children of certain legalized immigrants, widows of U.S. citizens, or victims of trafficking and domestic violence.[3] Most recently, beginning in 2012, Secretary Napolitano issued guidance for case-by-case deferred action with respect to those who came to the United States as children, commonly referred to as "DACA.’
*222 By this memorandum. I am now expanding certain parameters of DACA and issuing guidance for case-by-case use of deferred action for those adults who have been in this country since January 1, 2010. are the parents of U,S. citizens or lawful permanent residents, and who arc otherwise not enforcement priorities, as set forth in the November 20. 2014 Policies for the Apprehension. Detention and Removal of Undocumented Immigrants Memorándum.
The reality is that most individuals in the categories set forth below are hard-working people who have become integrated members of American society. Provided they do not commit serious crimes or otherwise become enforcement priorities, these people are extremely unlikely to be deported given this Department's limited enforcement resources' — which must continue to be focused on those who represent threats to national security, public safety, and border security. Case-by-case exercises of deferred action for children and long-standing members of American society who are not enforcement priorities arc in this Nation's security and economic interests and make common sense, because they encourage these people to come out of the shadow's, submit to background checks, pay fees, apply for work authorization (which by separate authority I may grant), and be counted.
A. Expanding DACA
DACA provides that those who were under the age of 31 on June 15. 2012, who entered the United States before June 15.2007 (5 years prior) as children under the age of 16, and who meet specific educational and public safety criteria, are eligible for deferred action on a case-by-case basis. The initial DACA announcement of June 15,2012 provided deferred action for a period of two years. On June 5. 2014, U.S. Citizenship and Immigration Services (USCIS) announced that DACA recipients could request to renew' their deferred action for an additional two years.
In order to further effectuate this program. 1 hereby direct USCIS to expand DACA as follows:
Remove the age cap. DACA will apply to all otherwise eligible immigrants who entered the United States by the requisite adjusted entry date before the age of sixteen (16). regardless of hów old they were in June 2012 or are today. The current age restriction excludes those who Were older than 31 on the date of announcement (Le., those who were bom before June 15.1981). That restriction will no longer apply.
Extend DACA renewal and work authorization to three-years. The period for which DACA and'thc accompanying employment authorization is granted will be extended to three-year increments, rather than the current two-year increments. This change shall apply to all first-time applications as w'ell as all applications for renewal effective November 24.2014. Beginning on that date. USCIS should issue all w'ork *223 authorization documents valid for three years, including to those individuals who have applied and are awaiting two-year work authorization documents based on the. renewal of their DACA grants. USCIS should also consider means to extend those two-year renewals already issued to three years.
Adjust the date-of-entry requirement. In order to align the DACA program more closely with the other deferred action authorization outlined below, the eligibility cut-off date by which a DACA applicant must have been in the United States should be adjusted from'June 15, 2007 to January 1,2010.
USCIS should begin accepting applications under the new criteria from applicants no later than ninety (90) days from the date of this announcement.
B. Expanding Deferred Action
I hereby direct USCIS to establish a process, similar to DACA, for exercising prosecutorial discretion through the use of deferred action, on a case-by-case basis, to those individuals who:
• have, on the date of this memorandum, a son or daughter who is a U.S. citizen or lawful permanent resident;
• have continuously resided in the United States since before January 1,2010;
• are physically present in the United States on the date of this memorandum, and at the time of making a request for consideration of deferred action with USCIS;
• have no lawful status on the date of this memorandum:
• are not an enforcement priority as reflected in the November 20.2014 Policies for the Apprehension. Detention and Removal of Undocumented Immigrants Memorandum; and
• present no other factors that, in the exercise of discretion, makes the grant of deferred action inappropriate.
Applicants must file the requisite applications for deferred action pursuant to the new criteria described above. Applicants must also submit biometrics for USCIS to conduct background checks similar to the background check that is required for DACA applicants. Each person who applies for deferred action pursuant to the criteria above shall also be eligible to apply for work authorization for the period of deferred action, pursuant to my authority to grant such authorization reflected in section 274A(h)(3) of *224 the Immigration and Nationality Act.[4] Deferred action granted pursuant to the program shall be for a period of three years. Applicants will pay the work authorization and biometrics fees, which currently amount to $465. There will be no fee waivers and. like DACA, very limited fee exemptions.
USCIS should begin accepting applications from eligible applicants no later than one hundred and eighty (180) days after the date of this announcement. As with DACA, the above criteria are to be considered for all individuals encountered by U.S. Immigration and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP). or USCIS, whether or not the individual is already in removal proceedings or subject to a final order of removal. Specifically:
• ICE and CBP are instructed to immediately begin identifying persons in their custody, as well as newly encountered individuals, who meet the above criteria and may thus be eligible for deferred action to prevent the further expenditure of enforcement resources with regard to these individuals.
• ICE is further instructed to review pending removal cases, and seek administrative closure or termination of the cases of individuals identified who meet the above criteria, and to refer such individuals to USCIS for case-by-case detenninations. ICE should also establish a process to allow individuals in removal proceedings to identify themselves as candidates for deferred action.
• USCIS is instructed to implement this memorandum consistent with its existing guidance regarding the issuance of notices to appear. The USCIS process shall also be available to individuals subject to final orders of removal who otherwise meet the above criteria..
Under any of the proposals outlined above, immigration officers will be provided with specific eligibility criteria for deferred action, but the ultimate judgment as to whether an immigrant is granted deferred action will be determined on a case-by-case basis.
This memorandum confers no substantive right, immigration status or pathway to citizenship. Only an Act of Congress can confer these rights. It remains w ithin the authority of the Executive Branch, however, to set forth policy for the exercise of prosecutorial discretion and deferred action within the framework of existing law. This memorandum is an exercise of that authority.
*225 [[Image here]]
This memorandum reflects new policies Ibr the apprehension, detention, and removal of aliens til this countrv This memorandum should be considered Depiulniojil-wide guidance. applicable to the activities of U.S. Immigration and Customs Fnlbreenifirt (ICR) U.S. Customs and Border Protection (CBP) and U.S, Cifi/enship and Immigration Services (USC1S). This memorandum should inform enforcement and removal activity, detention decisions budget requests and execution and strategic planning
In general our enforcement and removal policies should continue to prioritize threats to national svewrih public safety, and border security The intent oJ*this new policy is to provide clearer mid more effective guidance in the pursuit of those priorities. To promote public confidence in our enfoteement activities 1 am also directing herein greater transparency in the annual reporting of our removal .statistics, to include data that tracks lire priorities outlined below.
*226 The Department of Homeland Security (DHS) and its immigration components-CBP, ICE, and USCIS-are responsible for enforcing the nation's immigration laws. Due to limited resources, DHS and its Components cannot respond to all immigration violations or remove all persons illegally in the United States. As is true of virtually every other law enforcement agency, DHS must exercise prosecutorial discretion in the enforcement of the law. And, in the exercise of that discretion, DHS can and should develop smart enforcement priorities, and ensure that use of its limited resources is devoted to the pursuit of those priorities. DHS's enforcement priorities are, have been, and will continue to be national security, border security, and public safety. DHS personnel are directed to prioritize the use of enforcement personnel, detention space, and removal assets accordingly.
In the immigration context, prosecutorial discretion should apply not only to the decision to issue, serve, file, or cancel a Notice to Appear, but also to a broad range of other discretionary enforcement decisions, including deciding: whom to stop, question, and arrest; whom to detain or release; whether to settle, dismiss, appeal, or join in a motion on a case; and whether to grant deferred action, parole, or a stay of removal instead of pursuing removal in a case. While DHS may exercise prosecutorial discretion at any stage of an enforcement proceeding, it is generally preferable to exercise such discretion as early in the case or proceeding as possible in order to preserve government resources that would otherwise be expended in pursuing enforcement and removal of higher priority cases. Thus, DHS personnel are expected to exercise discretion and pursue these priorities at all stages of the enforcement process-from the earliest investigative stage to enforcing final orders of removal-subject to their chains of command and to the particular responsibilities and authorities applicable to their specific position.
Except as noted below, the following memoranda are hereby rescinded and superseded: John Morton, Civil Immigration Enforcement: Priorities for the Apprehension, Detention, and Removal of Aliens, March 2,2011; John Morton, Exercising Prosecutorial Discretion Consistent with the Civil Enforcement Priorities of the Agency for the Apprehension, Detention cmdRemoval ofAliens, June 17,20 11; Peter Vincent, Case-by-Case Review oflncormng and Certain Pending Cases, November 17, 2011; Civil Immigration Enforcement: Guidance on the Use ofDetainers in the Federal, State, Local, and Tribal Criminal Justice Systems, December 21,2012; National Fugitive Operations Program: Priorities, Goals, and Expectations, December 8,2009.
*227 A. Civil Immigration Enforcement Priorities
The following shall constitute the Departments civil immigration enforcement priorities:
Priority 1 (threats to national security, border security, and public safety)
Aliens described in this priority represent the highest priority to which enforcement resources should be directed:
(a) aliens engaged in or suspected of terrorism or espionage, or who otherwise pose adangertonational security;
(b) aliens apprehended at the border or ports of entry while attempting to unlawfully enter the United States;
(c) aliens convicted of an offense for which an element was active participation in a criminal street gang, as defined in 18U.S.C. § 521(a), or aliens not younger than 16 years of age who intentionally participated in an organized criminal gang to further the illegal activity of the gang;
(d) aliens convicted of an offense classified as a felony in the convicting jurisdiction, other than a state or local offense for which an essential element was the alien's immigration status; and
(e) aliens convicted of an "aggravated felony," as that term is defined in section 10 l(aX43) of the Immigration andNaiionality Act atthe time of theconviction.
The removal of these aliens must be prioritized unless they qualify for asylum or another form of relief under our laws, or unless, in thejudgment of an ICE Field Office Director, CBP Sector Chief or CBP Director of Field Operations, there are compelling and exceptional factors that clearly indicate the alien is not a threat to national security, border security, or public safety and should not therefore be an enforcement priority.
Priority 2 (misdemeanants and new immigration violators)
Aliens described in this priority, who are also not described in Priority 1, represent the second-highest priority for apprehension and removal. Resources should be dedicated accordingly to the removal of the following:
(a) aliens convicted of three or more misdemeanor offenses, other than minor traffic offenses or state or local offenses for which an essential element *228 was'the alien's immigration status, provided the offenses arise out of three separate incidents;
(b) alien s convicted of a "significant mi sdemeanor," which for these purp oses is an offense of domestic violence;[1] sexual abuse or exploitation; burglary; unlawful possession or use of a firearm; drug distribution or trafficking; or driving under the influence; or if not an offense listed above, one for which the individual was sentenced to time in custody of 90 days or more (the sentence must involve time to be seived in custody, and does not include a suspended sentence);
(c) aliens apprehended anywhere in the United States after unlawfully entering or re-entering the United States and who cannot establish to the satisfaction of an immigration officer that they have been physically present in the United States continuously since January 1,2014; and
(d) alienswho,in thejudgmentof an ICE Field Office Director,USCIS District Director, orUSCIS Service Center Director, have significantly abusedthevisaorvisawaiverprograms.
These aliens should be removed unless they qualify for asylum or another form of relief under our laws or unless, in the judgment of an ICE Field Office Director CBP Sector Chief, CBP Director of Field Operations, USCIS District Director or users Service Center Director, there are factors indicating the alien is not a threat to national security, border security, or public safety and should not therefore be an enforcement priority.
Priority 3 (other immigration violations)
Priority 3 aliens are those who have been issued a final order of removal2 on or after January 1, 2014. Aliens described in this priority, who are not also described in Priority 1 or 2, represent the third and lowest priority for apprehension and removal. Resources should be dedicated accordingly to aliens in this priority. Priority 3 aliens should generally be removed unless they qualify for asylum or another form of relief under our laws or, unless, in the judgment of an immigration officer the alien is not a threat to the integrity of the immigration system or there are factors suggesting the alien should not be an enforcement priority.
*229 R Apprehension, Deten tion, and Removal of Other Aliens Unlawfully in the United States
Nothing in this memorandum should be construed to prohibit or discourage the apprehension, detention, or removal of aliens unlawfully in the United States who are not identified as priorities herein. However, resources should be dedicated, to the greatest degree possible, to the removal of aliens described in the priorities set forth above, commensurate with the level of prioritization identified. Immigration officers and attorneys may pursue removal of an alien not identified as a priority herein, provided, in thejudgment of an ICE Field Office Director, removing such an alien would serve an important federal interest
C. Detention
As a general rule, DHS detention resources should be used to support the enforcement priorities noted above or for aliens subject to mandatory detention by law. Absent extraordinary circumstances or the requirement of mandatory detention, field office directors should not expend detention resources on aliens who are known to be suffering from serious physical or mental illness, who are disabled, elderly, pregnant, or nursing, who demonstrate that they are primary caretakers of children or an infirm person, or whose detention is otherwise not in the public interest. To detain aliens in those categories who arenot subjectto mandatory detention,DHS ' officers or special agents must obtain approval from the ICE F ield Office Director. If an alien falls within the above categories and is subjectto mandatory detention, field office directors are encouraged to contact their local Office of Chief Counsel for guidance.
D. Exercising Prosecutorial Discretion
Section A, above, requires DHS personnel to exercise discretion based on individual circumstances. As noted above, aliens in Priority 1 must be prioritized for removal unless they qualify for asylum or other form of relief under our laws, or unless. in thejudgment of an ICE Field Office Director, CBP Sector Chief or CBP Director of Field Operations, there are compelling and exceptional factors that clearly indicate the alien is not a threat to national security, border security, or public safety and should not therefore be an enforcement priority. Likewise, aliens in Priority 2 should be removed unless they qualify for asylum or other forms of relief under our laws, or unless, in the judgment of an ICE Field Office Director, CBP Sector Chief, CBP Director of Field Operations, USCIS District Director, or USCIS Service Center Director, there are factors indicating the alien is not a threat to national security, border security, or public safety and should not therefore be an enforcement priority. Similarly, aliens in Priority 3 should generally be removed unless they qualify for asylum or another form of relief under our laws or, unless, in thejudgment of an immigration officer, the alien is not a threat to the *230 integrity ofthe immigration system or there are factors suggesting the alien should not be an enforcement priority.
In making suchjudgments,DHS personnel should consider factors such as: extenuating circumstances involving the offense of conviction; extended length of time since the offense of conviction; length oftime in the United States; military service; family or community ties in the United States; status as a victim,witness or plaintiff in civil or criminal proceedings; or compelling humanitarian factors such as poor health, age, pregnancy, ayoung child, or a seriously ill relative. These factors are not intended to be dispositive nor is this list intended to be exhaustive. Decisions should be based on the totality ofthe circumstances.
E. Implementation
The revised guidance shall be effective on January 5,2015. Implementing training and guidance will be provided to the workforce prior to the effective date. The revised guidance in this memorandum applies only to aliens encountered or apprehended on or after the effective date, and aliens detained, in removal proceedings, or subject to removal orders who have not been removed from the United States as of the effective date. Nothing in this guidance is intended to modify USCIS Notice to Appear policies, which remain in force and effect to the extent they are not inconsistent with this memorandum.
F. Data
By this memorandum I am directing the Office of Immigration Statistics to create the capability to collect, maintain, and report to the Secretary data reflecting the numbers ofthose apprehended removed, returned, or otherwi se repatriated by any component of DHS and to report that data in accordance with the priorities set forth above. I direct CBP, ICE, and USCIS to cooperate in this effort. I intend for this data to be part ofthe package of data released by DHS to the public annually.
G. No Private Right Statement
These guidelines and priorities are not intended to, do not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter.

. During the period from 2009 through 2014, approximately 2.4 million aliens were removed from the United States. DHS claims that this is a record number, and Plaintiffs do not dispute that point.

. In their briefing on appeal, Plaintiffs refute the “mistaken premise that this lawsuit challenges [DHS]’s decision not to remove certain unauthorized aliens,” making clear that "[tjhis lawsuit has never challenged any decision by the Executive to initiate or forego removal proceedings." Appellees’ Suppl. Br. 18-19.

. Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 483-84, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999).

.The DAPA Memorandum is attached- as Appendix A. As Appendix B, I also attach the Secretary’s November 20, 2014, memorandum entitled "Policies for the Apprehension, Detention and Removal of Undocumented Immigrants” (Enforcement Priorities Memorandum), which itself is unchallenged by Plaintiffs, but which the DAPA Memorandum incorporates by reference.

. This statute was passed in 2002.

. A version of this statute was first passed in 1990.

. The limited resources that Congress has made available to DHS for removals are most probably a product of the nation’s limited resources, not of penuriousness on the part of Congress.

. The Enforcement Priorities Memorandum classifies aliens into three priority categories: (1) "Priority 1 (threats to national security, border security, and public safety)”; (2) "Priority 2 (misdemeanants and new immigration violators)”; and (3) "Priority 3 (other immigration violations).” Appx. B, at 3-4. It further states that "resources should be dedicated, to the greatest degree possible, to the removal of aliens described in the priorities set forth above, commensurate with the level of prioritization identified.” Appx. B, at 5.

. The Memorandum also summarizes the substantial past use of deferred action. Appx. A, at 2.

. Therefore, if Congress were to substantially increase the amount of funding available to DHS for removals, deferred action would pose no impediment to the removal even of these low-priority aliens.

. DHS contends that the fees collected will ■ be sufficient to offset any administrative costs required to implement the DAPA Memorandum.

. As discussed below, this is merely a statement of preexisting law. See 8 C.F.R. § 274a.l2(c)(14).

. The majority suggests that the APA does provide specific authorization for suit here because it “authorizes challenges to ‘final agency action for which there is no other adequate remedy in a court.’ ” Majority Op. at 151 (citing 5 U.S.C. § 704). If this were the case, then presumably Massachusetts would have also referenced the APA as conferring a procedural right since the plaintiffs there challenged “final agency action” within the *194 ambit of the APA. Massachusetts did not, however, even refer to the APA. And, as discussed below, it would be odd if the APA provided such an expansive procedural right to states.

. The notion of "special solicitude” was cited in Arizona State Legislature v. Arizona Independent Redistricting Commission (AIRC), - U.S. -, 135 S.Ct. 2652, 2664-65 n. 10, 192 L.Ed.2d 704 (2015) — but as recognized by a treatise, in a footnote, in an opinion that did not concern federal-state suits. That footnote correctly observed that "[t]he cases on the standing of states to sue the federal government” are “hard to reconcile.” Id. (quoting R. Fallon et ah, Hart and Wechsler’s The Federal Courts and the Federal System 263-66 (6th ed.2009)).

. The majority cites a number of cases to show that courts have held that states have standing to sue the federal government. Majority Op. at 152-53. Many of these cases are inapposite. Alaska v. U.S. Department of Transportation, 868 F.2d 441, 443-45 (D.C.Cir.1989), found standing because the FAA, much like the CAA in Massachusetts, created a procedural right to sue available to states. The court in Virginia ex rel. Cuccinelli v. Sebelius, 656 F.3d 253, 272 (4th Cir.2011), actually denied standing. And Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez, 458 U.S. 592, 102 S.Ct. 3260, 73 L.Ed.2d 995 (1982), Diamond v. Charles, 476 U.S. 54, 106 S.Ct. 1697, 90 L.Ed.2d 48 (1986), and Maine v. Taylor, 477 U.S. 131, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986), did not involve federal-state suits. It is true that courts found state standing against the federal government in Ohio ex rel. Celebrezze v. U.S. Department of Transportation, 766 F.2d 228, 232-33 (6th Cir.1985), Texas Office of Public Utility v. Federal Communications Commission, 183 F.3d 393, 449 (5th Cir.1999), Wyoming ex rel. Crank v. United States, 539 F.3d 1236, 1241-44 (10th Cir.2008), and New Mexico ex rel. Richardson v. Bureau of Land Management, 565 F.3d 683, 696 n.13 (10th Cir.2009), respectively. However, Celebrezze preceded the Supreme Court's more rigorous standing cases (i.e., post-Lujan v. Defenders of Wildlife, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). And Texas Office of Public Utility, Crank, and Richardson offered very curso *195 ry examinations of state standing bereft of the sweeping language the majority uses today.

. Recognizing the tension between these two cases, the majority claims that Texas’s injury is like that of Wyoming in Wyoming v. Oklahoma, and not like that of Pennsylvania in Pennsylvania v. New Jersey. But a principal difference in these cases was that Pennsylvania, like Texas, tied its law to that of another sovereign, whereas Wyoming did not. See Pennsylvania, 426 U.S. at 663, 96 S.Ct. 2333 ("Pennsylvania permits a tax credit to any of its residents for income taxes paid to other States, including, of course, New Jersey.”). The majority asserts that forcing Texas to change its laws would be an injury because states have "a sovereign interest in 'the power to create and enforce a legal code.’ ” Majority Op. at 156 (footnote omitted). Yet if that is enough of an injury, then presumably Pennsylvania should have had standing in Pennsylvania v. New Jersey, as Pennsylvania was faced with an instance where it could avoid injury but would have had to change its laws by "withdrawing th[e] credit for taxes paid to New Jersey.” Pennsylvania, 426 U.S. at 664, 96 S.Ct. 2333. The Court found that this was *196 not a traceable injury, suggesting Texas’s injury today is similarly "self-inflicted.” Id.

. For this very reason, Plaintiffs do not challenge the Enforcement Priorities Memorandum. See Majority Op. at 166 (“[Tjhe states have not challenged the priority levels [the Secretary] has established.” (footnote omitted)).

.The majority repeatedly cites Arizona to support its position, including an assertion that "[t]he pervasiveness of federal regulation does not dimmish the importance of immigration policy to the States.” Majority Op. at 162-63 (citing Arizona, 132 S.Ct. at 2500). To say the least, the majority's reliance on Arizona is misplaced. Arizona repeatedly approved of broad discretion in federal immigration enforcement and actually held that a state law concerning immigration was preempted.

. Nor does the DAPA Memorandum do anything to change the eligibility criteria for these benefits.

. A predecessor regulation enacted in 1981 similarly stated that “[a]ny alien in whose case the district director recommends consid *198 eration of deferred action, an act of administrative convenience to the government which gives'some cases lower priority” may apply for work authorization "[p]rovided, [t]he alien establishes to the satisfaction of the district director that he/she is financially unable to maintain himselfherself and family without employment.” 46 Fed. Reg. 25,079, 25,081 (May 5, 1981) (formerly codified at 8 C.F.R. § 109.1(b)(6)).

.Plaintiffs suggested at oral argument that they were challenging the statutory underpinnings of 8 C.F.R. § 274a.l2(c)(14), but that position is inconsistent with their briefing on appeal, in which they contend that the work authorization regulation "is not facially invalid,” and in which they "assum[e] arguendo that the regulation is valid in all applications.” Appellees' Br. 21 n.9. Moreover, throughout this litigation, Plaintiffs stated that they were challenging only the validity of the DAPA Memorandum; this is underscored by the complaint, which does not mention any challenge to the validity of 8 C.F.R. § 274a.l2(c)(14). In any event, Plaintiffs’ minimal and inconsistent briefing as to this issue cannot be considered sufficient to mount a challenge to a notice-and-comment regulation that has been on the books for decades, and we should not decide this issue. See United States v. Scroggins, 599 F.3d 433, 446 (5th Cir.2010) ("A party that asserts an argument on appeal, but fails to adequately brief it, is deemed to have waived it. It is not enough to merely mention or allude to a legal theory.” (internal citations omitted)).

. Congress, of course, can limit those to whom work authorization is granted, see 8 U.S.C. § 1226(a)(3) (barring the Attorney General from granting work authorization to aliens who are "arrested and detained pending a decision on whether the alien is to be removed from the United States”), but it has not done so with respect to those eligible for deferred action under DAPA.

. See 8 U.S.C. § 1182(a)(9)(B)(ii) (passed in 1997) (stating that "[flor purposes of [the illegal entry bars], an alien is deemed to be unlawfully present in the United States if the alien is present in the United States after the expiration of the period of stay authorized by the Attorney General or is present in the United States without being admitted or paroled” (emphasis added)); Dhuka v. Holder, 716 F.3d 149, 156 (5th Cir.2013) (" '[Authorized by the Attorney General' describes an exercise of discretion by a public official.” (quoting 8 U.S.C. § 1182(a)(9)(B)(ii))). DHS contends that this "benefit” is largely irrelevant here, as the vast majority of potential DAPA recipients have already accrued sufficient unlawful presence to trigger these statutory bars to admissibility.

. See 8 U.S.C. § 1611 (b)(2) — (3) (passed in 1997) (stating that aliens "lawfully present in the United States as determined by the Attorney General” are not barred from receiving certain Social Security and Medicare benefits); 8 C.F.R. § 1.3(a)(4)(vi) (promulgated in 2011) (defining an "alien who is lawfully present in the United States” to include "[a]liens currently in deferred action status”).

.See 20 C.F.R. § 422.104(a)(2) (promulgated in 2003) (stating that "[a]n alien ... under other authority of law permitting [the alien] to work in the United States” is "eligible for SSN assignment”); 20 C.F.R. § 422.105(a) (promulgated in 2004) (stating that "a current document authorized by [DHS] that verifies authorization to work has been granted” is sufficient documentation "to enable SSA to issue an SSN card that is valid for work”). Under preexisting statutes and regulations, obtaining a Social Security number may also trigger other benefits, such as earned income tax benefits. See 26 U.S.C. § 32(c)(1)(E), (m) (passed in 1997).

. Of course, the DAPA Memorandum itself does not grant anyone deferred action. Those decisions will be made in the future by DHS agents guided by the DAPA Memorandum.

. Strangely, the majority cites to Reno to support its conclusion that Plaintiffs’ claims are justiciable. Reno stressed the broad discretion afforded to federal immigration officials and found the case at hand to be non-justiciable based on certain jurisdiction-stripping provisions of the INA. Reno, 525 U.S. at 484-92, 119 S.Ct. 936.

. This approach would not, as Plaintiffs suggest, constitute a "novel extension of Heckler," allowing DHS to insulate grants of benefits from judicial review by attaching them to any enforcement policy. Appellees’ Br. 18. Rather, the crucial fact rendering this action non-justiciable is that the benefits at issue are not being granted by the Memorandum itself. Thus, Plaintiffs' doomsday scenario of DHS "granting] ... voting rights ... in conjunction with a non-removal policy,” Appellees' Br. 18-19, would certainly be reviewable, as no preexisting statute or regulation grants voting rights to deferred action recipients.

. In determining that DHS has adopted such a policy, the district court reasoned that "the Government here is 'doing nothing to enforce’ the removal laws against a class of millions of individuals.” Dist. Ct. Op., 86 F.Supp.3d at 663 (quoting Texas, 106 F.3d at 667). But by cabining its sample size only to DAPA-eligible individuals, and ignoring DHS’s record number of enforcement efforts against others, the district court’s conclusion was preordained. Under the district court's logic, if DHS grants deferred action to ten individuals, it would have "abdicated its duty” to enforce the immigration laws as to those ten individuals— *201 rendering that action reviewable. Reading Heckler’s narrow exception so broadly would swallow the general rule that “an agency’s decision not to take enforcement action should be presumed immune from judicial review.” Heckler, 470 U.S. at 832, 105 S.Ct. 1649. The majority does not appear to endorse this misrepresentation today.

. While the majority suggests DAPA is more than ‘'nonprosecution” because it "remov[es] a categorical bar on [the] receipt of ... benefits,” Majority Op. at 167, diversion also removes a categorical bar on the receipt of benefits as convicted drug offenders are otherwise ineligible for certain public benefits. See, e.g., 21 U.S.C. § 862a(a) (preventing these offenders from receiving TANF and food stamps).

. As noted by DHS and various amici, the granting of deferred action — even to whole classes of individuals — has occurred for decades, under both Republican and Democratic administrations.

. As the Fifth Circuit has noted, in determining whether a rule is substantive, and thus subject to notice-and-comment procedures, we must "focus[] primarily on whether the rule has binding effect on agency discretion or severely restricts it.” Prof'ls & Patients, 56 F.3d at 595 (footnote omitted). Plaintiffs now appear to argue (for the first time) on appeal that regardless of the discretion it confers, the DAPA Memorandum is a substantive rule because it “changed the law” by granting benefits to 4.3 million individuals. But as discussed above, the DAPA Memorandum itself confers no additional benefits. Moreover, the scale of the program has no bearing on the substantive rule inquiry — i.e., whether the policy will be administered with case-by-case discretion. See id.; McLouth Steel Prods. Corp. v. Thomas, 838 F.2d 1317, 1320 (D.C.Cir.1988) ("The question for purposes of [5 U.S.C.] § 553 is whether a statement is a rule of present binding effect; the answer depends on whether the statement constrains the agency’s discretion.”). Indeed, Plaintiffs put it best in a letter brief filed with the district court: "To be sure, 'case-by-case discretion' determines whether the [Memorandum] is a ‘substantive rule' under the APA.”

. The Memorandum also states that (1) “DHS must exercise prosecutorial discretion in the enforcement of the law”; (2) our immigration laws "are not designed to be blindly enforced without consideration given to the individual circumstances of each case”; (3) "[d]eferred action is a form of prosecutorial discretion by which the Secretary depriori-tizes an individual's case for humanitarian reasons, administrative convenience, or in the interest of the Department's overall enforcement mission”; (4) "deferred action is legally available so long as it is granted on a case-by-case basis, and it may be terminated at any time at the agency’s discretion”; (5) “[h]istor-ically, deferred action has been used ... on a case-by-case basis”; (6) "I am now expanding certain parameters of DACA and issuing guid-anee for case-by-case use of deferred action”; (7) "[c]ase-by-case exercises of deferred action for children and long-standing members of American society who are not enforcement priorities are in this Nation's security and economic interests”; (8) "I hereby direct US-CIS to establish a process ... for exercising prosecutorial discretion through the use of deferred action, on a case-by-case basis”; (9) “ICE is ... instructed to review pending removal cases ... of individuals identified who meet the above criteria, and to refer such individuals to USCIS for case-by-case determinations”; and (10) “[fit remains within the authority of the Executive Branch ... to set forth policy for the exercise of prosecutorial discretion and deferred action within the framework of existing law.” Appx. A, at 1-5.

. For example: whether the applicant has "a son or daughter who is a U.S. citizen or lawful permanent resident.” Appx. A, at 4.

. Although these criteria come from the Enforcement Priorities Memorandum, the DAPA Memorandum incorporates these criteria into its own, stating that deferred action may be granted to individuals who "are not an enforcement priority as reflected in the” Enforcement Priorities Memorandum. Appx. A, at 4.

. Similarly, an agent implementing the DACA Memorandum must make the threshold discretionary determinations of whether the applicant has been convicted of "a significant misdemeanor,” and whether the applicant "poses a threat to national security or public safety.” And as we concluded in Crane, the DACA Memorandum too "makes it clear that the Agents shall exercise their discretion in deciding to grant deferred action, and this judgment should be exercised on a case-by-case basis.” Crane, 783 F.3d at 254-55.

.The majority perpetuates this error today by accepting the district court's characterizations of DAPA without question — despite recognizing that there was "conflicting evidence” below and that extrapolating DAPA from DACA needed to "be done carefully.” Majority Op. at 173, 175.

. "Lawful presence,” as previously indicated, is also not a substantive right, but rather a form of nonprosecution that can be revoked at any time. Any purported harm to Texas is incidental and not contemplated by DAPA.

. The majority suggests that there is a "burden imposed on Texas” by DAPA and even then concedes that this "is derivative of issuing lawful presence to beneficiaries.” Majority Op. at 177. But the analysis centers on the effect of the policy statement on regulated entities, and Texas is plainly not regulated by or even mentioned in the DAPA Memorandum.

. As several amici argue, a challenge to a statement of policy as pretextual may be unripe prior to the policy’s implementation. For example, where:
[T]he facts are so wholly ambiguous and unsharpened as not to present a purely legal question 'fit ... for judicial decision,' and where the agency's characterization of its action would fit them cleanly into a § 553 exemption, ... the most prudent course [is] to await the sharpened facts that come from the actual workings of the regu *208 lation in question before striking the objective down as violative of the APA.
Am. Hosp. Ass’n v. Bowen, 834 F.2d 1037, 1056 (D.C.Cir.1987) (first alteration in original) (internal citation omitted); see Hudson v. FAA, 192 F.3d 1031, 1034-35 (D.C.Cir.1999); Pub. Citizen, Inc., 940 F.2d at 683.

. The majority appears to endorse the district court's reliance on presidential statements as it too cites the President's remark that he " ‘change[d] the law’ " as support for concluding that DAPA is beyond the scope of the INA. Majority Op. at 185.

. The district court noted that this voter initiative definition is the “sole definition offered for ‘initiative’ ” in Black’s Law Dictionary. Dist. Ct. Op., 86 F.Supp.3d at 668. There are, of course, other dictionaries — dictionaries far more likely to capture DHS’s intended use of the word in a website created to describe DAPA to the public (rather than to attorneys or judges). For example, the first definition of “initiative” in the Oxford English Dictionary is "[flhat which initiates, begins, or originates,” Initiative, The Oxford English Dictionary (2d ed.1989) — a definition that certainly does not imply a binding norm.

.In addition, as Judge Higginson noted in his dissent, DACA is materially distinguishable from DAPA because the former applies only to "a subset of undocumented immigrants who are particularly inculpable as they 'were brought to this country as children' and, thus, lacked the intent to violate the law.’ ” Texas, 787 F.3d at 781 (Higginson, J., dissenting) (quoting the DACA Memorandum). Accordingly, it would be reasonable to expect that denial rates under DAPA would be higher than those under DACA, as DACA applicants are far less likely to' exhibit other factors (e.g., a threat to national security) that would prompt an exercise of discretion not to grant deferred action.

. This rate represents 38,080 denials out of the 723,358 applications accepted for processing at USCIS service centers through December 2014. There were an additional 42,919 applications rejected for purely administrative reasons during this time period. Neither of these numbers suggests an agency on autopilot.

. The majority's acceptance of this passage is but one illustration of the problem with relying on the district court's factual conclusions.

. As discussed above, this focus was misplaced, as application of both the DACA and DAPA criteria themselves involves the exercise of discretion.

. Yet again, this focus ignores the discretion inherent in those criteria.

.Palinkas also focuses on the USCIS’s announcement that it will create a new service center for the processing of DAPA applications, to be staffed by approximately 700 US-CIS employees and 300 federal contractors. But the fact that so many agents are necessary to assess DAPA applications is inconsis *212 tent with the notion that the review will be conducted in a mechanical, pro forma manner.

. Applications are first mailed to USCIS "lockboxes,” where they are reviewed to determine whether they should be rejected for administrative reasons.

. Neufeld notes, consistent with the discussion above, that "USCIS must ... exercise significant discretion in determining whether” some of the DACA guidelines apply; for example, "determining whether a requestor 'poses a threat to national security or public safety’ necessarily involves the exercise of the agency’s discretion.”

.Such discretionary denials are generally reviewed at USCIS headquarters.

. The district court did not, however, make an express finding that it deemed the Palinkas Declaration more credible than the Neufeld Declaration.

. Even Plaintiffs noted, after DHS submitted the Neufeld Declaration, that "if the Court decides that the Defendants’ new declarations create a material fact dispute of material consequence to the motion ..., the comet step would be to hold a second hearing.”

.It appears that no court in the country has accepted this radical theory of standing. Indeed, the district court admitted that it had "not found a case where the plaintiff's standing was supported solely on this basis." Dist. Ct. Op., 86 F.Supp.3d at 643 n. 48. The ma *214 jority’s broad concept of state standing based on harm to "quasi-sovereign interests” is strikingly similar to this theory of standing. See Majority Op. at 153 ("When the states joined the union, they surrendered some of their sovereign prerogatives over immigration.”).

. In addition, the district court stated: (1) "DHS has clearly announced that it has decided not to enforce the immigration laws as they apply to approximately 4.3 million individuals”; (2) "Secretary Johnson announced that the DHS will not enforce the immigration laws as to over four million illegal aliens eligible for DAPA, despite the fact that they are otherwise deportable”; (3) “As demonstrated by DACA and DAPA ..., the Government has decided that it will not enforce these immigration laws as they apply to well over five million people”; (4) “The DHS unilaterally established the parameters for DAPA and determined that it would not enforce the immigration laws as they apply to millions of individuals”; and (5) "the DHS does not seek compliance with the federal law in any form, but instead establishes a pathway for noncompliance and completely abandons entire sections of this country's immigration law.” Id. at 637 n.45, 638-43. The district court also characterized DAPA as an "announced policy of non-enforcement.” Id. at 637 n.45. Although these quotations from the district court’s opinion focus on what it perceives to’ be the failures of DHS to enforce the immigration laws, at other places in that opinion, the district court identifies the decades-long failure of Congress to fund what the district court would consider adequate enforcement.

. There might not be much left in the way of factual development of the record, see Majority Op. at 178 n. 158, but there is much left wanting in the way of legal development.

. Appellees’ Br. 47-50; Appellants' Reply Br. 21-23; Appellants' Suppl. Br. 27-29; Ap-pellees’ Suppl. Br. 15-17.

. The majority makes much of the scope of DAPA in concluding that it violates the APA. See Majority Op. at 179, 181. Yet the conclusions regarding DAPA’s legality are similarly applicable to ad hoc deferred action. Ad hoc deferred action triggers the same eligibility for benefits and Congress has not directly mentioned it by statute. It should follow then that ad hoc deferred action is also not authorized by the INA and is a substantive APA violation. But this cannot be the case for the reasons mentioned below. Despite the majority's emphasis on the scale of DAPA, its size plays no role in whether or not it is authorized by statute. I am aware of no principle that makes scale relevant in this analysis, and the majority does not cite any authority otherwise. The question of whether an agency has violated its governing statute does not change if its actions affect one person or "4.3 million” persons. Id. at 179.

. The Court in Reno noted that "[pjrior to 1997, deferred-action decisions were governed by internal INS guidelines which considered [a variety of factors].” Reno, 525 U.S. at 484 n.8, 119 S.Ct. 936. Although the guidelines were rescinded, the Court also observed that "there [was] no indication that the INS has ceased making this sort of determination on a case-by-case basis.” Id.

. The Office of Legal Counsel, in its evaluation of DAPA, noted that Congress had given its "implicit approval” to deferred action over the years. Office of Legal Counsel, The Department of Homeland Security’s Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others 30-31 (2014), available at http://www.justice.gov/sites/defaull/files/olc/ opinions/attachments/2014/11/20/2014-11-19-auth-prioritize-removal.pdf.

. The majority’s ruling that class-wide deferred action violates the INA is potentially devastating. The definition of a class is expansive: "A group of people, things, qualities, or activities that have common characteristics or attributes.” Class, Black’s Law Dictionary (10th ed.2014). I suspect that DHS frequently grants deferred action to two or more aliens with common characteristics.

. If 8 C.F.R. § 274a.l2(c)(14) were contrary to the INA, then presumably the challenge in Perales would have been justiciable since an agency’s "abdication of its statutory responsibilities” is sufficient to overcome the presumption that agency inaction is unreviewable. Heckler, 470 U.S. at 833 n.4, 105 S.Ct. 1649.

 Deferred action, in one form or another, dates back to at least the )960s. •‘Deferred action’ per se dates back at least as far as 1975. See, Immigration and Naturalization Service. Operation Instructions § 103. i (a)( 1 )(ii) (1975).

 INA <j 204(aXI)(D)(i.Xll), (IV) (Violence Against Women Act (VAWA) self-petitioners not in removal proceedings are "eligible for deferred action and employment authorization "j: INA § 237{dX2) (DHS may grant stay of removal to applicants for T or U visas bul that denial of a stay request "shall not preclude the alien from applying for . . deferred action"j: REAL ID Act of 2005 § 202(c)(2)(B)(viii), Pub. L. 109-13 (requiring states to examine documentary evidence of lawful stains for driver's license eligibility purposes, including "approved deferred action status "j‘, National Defense Authorization Act for Fiscal Year 2004 § 1703(c) (d) Pub. L. 108-136 ft/mi/se. parent or child of certain US. citizen M-ho died as a result of honorable service may self-petition for permanent residence and "shall be eligible for deferred action, advance parole, and work authorization ").

 In August 2001, the former-immigration and Naturalization Service issued guidance providing deferred action to individuals who were eligible for the recently created U and T visas. Two years later, USCIS issued subsequent guidance, instructing its officers to use existing mechanisms like deferred action for certain U visa applicants facing potential removal. More recently, in June 2009, USCIS issued a memorandum providing deferred action to certain surviving spouses of deceased U.S. citizens and their children while Congress considered legislation to allow these individuals to qualify for permanent residence status.

 iNA § 274A(li); 3). 8 L'.S.C. § I324a(h)(3) CAs used in this section, the term ’unauthorized alien' means, with respect to the employment of an alien at a particular time, that the alien is not at that time either (A) an alien lawfully admitted for permanent residence, or (B) authorized to be so employed by this chapter or by the[Secretary]."l; 8 C.F.R. J 274a. 12 (regulations establishing classes of aliens eligible for work authorization).

 In evaluating whether the offense is a significant misdemeanor involving ..domestic violence careful consideration should be given to whether the convicted alien was also the victim of domestic violence; if so this should be a mitigating factor. See generally John Morton Prosecutorial Discretion Certain Victim, Witnesses, andPlaintiffs, June 17 201 1.
For present purposes final order is defined as it is in 8C.F.R. § 1241.1.